THOMAS BRENNAN *v.* BRENNAN
ASSOCIATES ET AL.
(SC 17812)
(SC 17813)

Norcott, Katz, Palmer, Zarella and Silbert, Js.

Argued February 9—officially released August 18, 2009

*James Coyne,* with whom were *Colleen Fries* and, on the brief, *George C. Markley* and *Shelley R. Sadin,* for the appellant-appellee (plaintiff).

*Christopher Rooney,* with whom were *John Farnsworth, A. Reynolds Gordon* and *Richard Kaczak,* for the appellees-appellants (defendant David Lehn et al.).

KATZ, J. As aptly described by the trial court, "[t]his particular case is the unhappy story of a financially successful [partnership] that became an environment of distrust, rancor and paralysis after the untimely death of [one of the four partners]." On one side is the plaintiff, Thomas Brennan, one of the partnership's founding members. On the other side are the defendants: the named defendant, the partnership of Brennan Associates (partnership); the two other surviving partners; and the four coadministrators (administrators) of the estate of the deceased partner, Richard Aiello (decedent).[1] The plaintiff appeals from the trial court's judgment granting the counterclaim filed by the defendant partners, Alexander Aiello and Serge Mihaly, seeking the plaintiff's expulsion from the partnership, pursuant to General Statutes § 34-355 (5) (C),[2] and denying the plaintiff's request for a permanent injunction barring the defendants from blocking his full access to the partnership records. All of the defendants except the partnership cross appeal from, inter alia, the trial court's

---

[1] The defendant partners are Alexander Aiello and Serge Mihaly. The defendant administrators are David Lehn, Peter DiNardo, Leonard DiNardo and Salvatore DiNardo. Salvatore DiNardo, the decedent's first cousin, is the father of Peter DiNardo and Leonard DiNardo, who are the decedent's first cousins once removed. We refer to Peter DiNardo, Leonard DiNardo and Salvatore DiNardo individually by their full names and collectively as the DiNardos. References to the partnership, Aiello, Mihaly and the administrators collectively are to the defendants.

[2] General Statutes § 34-355 provides in relevant part: "A partner is dissociated from a partnership upon the occurrence of any of the following events . . .

"(5) On application by the partnership or another partner, the partner's expulsion by judicial determination because: (A) The partner engaged in wrongful conduct that adversely and materially affected the partnership business; (B) the partner wilfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or the other partners under section 34-338; or (C) the partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner . . . ."

judgment denying their request for that court to conduct a proceeding for the valuation of the plaintiff's partnership interest while the plaintiff's appeal was pending.[3] We affirm the trial court's judgment.

The record reveals the following undisputed facts and procedural history. In 1984, the plaintiff, the decedent, Aiello and Mihaly executed an agreement whereby they formed the partnership, principally for the management and operation of a shopping center they owned in Trumbull. The plaintiff and the decedent each held a 32 percent interest in the partnership, Aiello held a 25 percent interest and Mihaly held an 11 percent interest. Because each partner's number of votes was equal to his partnership interest, and a 70 percent vote was necessary for any business initiative proposed, the plaintiff and the decedent each held a sufficient interest to veto any proposed initiative.

Until his death in December, 2004, the decedent essentially ran the partnership. He negotiated all of the

[3] The defendants; see footnote 9 of this opinion; also raised in their cross appeal the issues of whether the trial court improperly had granted the plaintiff's request for a declaratory judgment that the only assignable partnership interest from the decedent's estate is an economic interest, such that any assignment of the decedent's management and voting rights required unanimous consent of the partners. We have declined to address these issues at this time, however, in light of our resolution of all of the issues pertaining to the plaintiff's partnership interest and other factors. Specifically, in light of our conclusion in part I of this opinion affirming the trial court's decision to expel the plaintiff from the partnership, the admission by Aiello and Mihaly that they have consented to the assignment of the decedent's full partnership interest to the defendants Peter DiNardo and Leonard DiNardo and the clear provision in the partnership agreement allowing for such an assignment upon the unanimous consent of the partners, it appears that Aiello and Mihaly will have the power to grant the relief that they seek from this court, namely, assignment of the decedent's full partnership interest. Therefore, we have issued an order to the defendants directing them to notify this court as to whether there is any continuing need for this court to resolve these issues in light of our resolution of the other claims in the appeal and the cross appeal. We will continue to exercise jurisdiction over their cross appeal pending resolution of this matter.

leases, performed all of the improvements and paid all of the bills. He kept the partnership books at an office where he also kept records for two other partnerships. The plaintiff, Aiello and Mihaly were essentially silent partners and were fully content with the decedent's management of the partnership.

After the decedent's death, in January, 2005, his attorney, Thomas Welch, held a meeting with the three surviving partners and others who had an interest in the disposition of the decedent's partnership interest pursuant to the decedent's will. The will directed the sale of the decedent's interest in the partnership to his cousins, the defendants Peter DiNardo and Leonard DiNardo. Welch informed those present that he hoped to transfer the decedent's interest as soon as feasible, with no one expressing opposition at that time. Welch later was replaced as administrator, on his own motion, by another attorney, the defendant David Lehn. Lehn later obtained permission to have Peter DiNardo, Leonard DiNardo and their father, the defendant Salvatore DiNardo, added as administrators of the decedent's estate.

Shortly after the reading of the will, the harmony between the surviving partners deteriorated. They reached an impasse over many issues, including check signing authority, control over and access to partnership books, and decisions relating to the management of the shopping center. The plaintiff also came to believe that Aiello and Salvatore DiNardo had committed insurance fraud in relation to claims that had been submitted to the partnership's insurance company. At some point, the plaintiff made an offer to buy the decedent's share of the partnership, which Lehn rejected.

In March, 2005, the plaintiff commenced the present action against the defendants. In his revised amended complaint, the plaintiff sought a declaratory judgment

that the disposition of the decedent's partnership interest constituted an event of dissociation[4] that: (1) triggered the right of the surviving partners to purchase the decedent's full partnership interest; (2) in the absence of unanimous consent of the surviving partners, precluded the decedent's estate from transferring the decedent's full partnership interest to Peter DiNardo and Leonard DiNardo; and (3) would render any purported assignment of the decedent's interest to Peter DiNardo and Leonard DiNardo effective as to only the economic interest and not any management or voting rights. The plaintiff also sought a permanent injunction to, inter alia, prohibit the defendants from blocking his access to the partnership's records.[5] Finally, the plaintiff

---

[4] Although not defined under Connecticut's Uniform Partnership Act, General Statutes §§ 34-300 through 34-399, the commentary to the Revised Uniform Partnership Act of 1997 on which Connecticut's act is modeled, explains that dissociation "denote[s] the change in the relationship caused by a partner's ceasing to be associated in the carrying on of the business." Rev. Unif. Partnership Act of 1997, § 601, comment (1), 6 U.L.A., Pt. 1, p. 164 (2001); see also D. Weidner & J. Larson, "The Revised Uniform Partnership Act: The Reporter's Overview," 49 Bus. Law. 1, 7 (1993) ("to say that a partner is dissociated is to say that the partner no longer continues as a co-owner of an on-going business"); cf. General Statutes § 34-101 (6) (defining " '[e]vent of dissociation' " as "an event that causes a person to cease to be a member [of a limited liability company]"). As one court has explained, "[a] partner can be dissociated from a partnership without causing the dissolution of the partnership or requiring the winding up of its affairs. When a partner dissociates from a partnership, the partner loses the right to participate in the management and conduct of the partnership business." *Costa* v. *Borges*, 145 Idaho 353, 357, 179 P.3d 316 (2008).

[5] The plaintiff also sought a permanent injunction: "prohibiting [the] defendants from representing that the DiNardos are the managing partners of [the partnership]"; "prohibiting the DiNardos from participating in the management or conduct of the [partnership] business except as is appropriate in the capacities as the [administrators] of the estate of [the decedent]"; and "requiring the holder of the interest in [the partnership] owned by [the decedent] at his death to sell such interest to [the plaintiff] and/or [the partnership], at a price to be determined pursuant to [General Statutes] § 34-362 (b)." The trial court denied these requests, concluding with respect to the first two that, after its ruling on the summary judgment motions had clarified the administrators' legal status vis-á-vis the decedent's partnership interest, they had conducted themselves properly.

sought to have himself appointed as a receiver to supervise the partnership during the pendency of the trial on this matter because of alleged misconduct by Aiello and the DiNardos.[6]

The administrators, Aiello and Mihaly thereafter each filed counterclaims against the plaintiff. The administrators sought a declaratory judgment that the decedent's death was not an event of dissociation, that the decedent's estate holds the decedent's full partnership rights, including management and voting rights, and that the plaintiff's withholding of consent for the estate to assign the decedent's full partnership interest to Peter DiNardo and Leonard DiNardo is unreasonable. Aiello and Mihaly sought a judicial determination expelling the plaintiff from the partnership pursuant to § 34-355 (5). They claimed that the plaintiff's conduct constituted grounds for dissociation under each of the three subparagraphs of that statute. See footnote 2 of this opinion.

The plaintiff and the administrators subsequently filed cross motions for partial summary judgment as to the issues concerning the decedent's partnership interest. The trial court's resolution of the motions turned on the extent to which the partnership agreement addressed the issues raised and to what extent resort was necessary to the Connecticut Uniform Partnership Act (partnership act), General Statutes §§ 34-300 through 34-399, to fill any gaps in the agreement. The court rejected the plaintiff's contention that the decedent's death was an event of dissociation that triggered the right of the surviving partners to buy the decedent's interest, if the partnership was not dissolved. The court concluded that the partnership agreement specifically

---

[6] Although the plaintiff's complaint merely requested appointment of a receiver, without indicating that he sought the appointment for himself, the court found that this was the plaintiff's intent, and the plaintiff has not disputed that finding on appeal.

provided that, upon a partner's death, the partner's estate or representative "shall succeed to such partner's interest" and cloaks such representative with "all [of] the powers of such [p]artner." In light of those expressly conferred powers, the court also rejected the plaintiff's contention that the administrators did not succeed to all of the powers held by the decedent at his death, including authority to enter into agreements encumbering the partnership's assets and to conduct banking. The court agreed with the plaintiff, however, that "only [the decedent's] share of distributions, along with the other incidents to a partnership interest enumerated by General Statutes § 34-348,[7] may be transferred to [Peter

[7] General Statutes § 34-348 provides: "(a) A transfer, in whole or in part, of a partner's transferable interest in the partnership:

"(1) Is permissible;

"(2) Does not by itself cause the partner's dissociation or a dissolution and winding up of the partnership business; and

"(3) Does not, as against the other partners or the partnership, entitle the transferee, during the continuance of the partnership, to participate in the management or conduct of the partnership business, to require access to information concerning partnership transactions or to inspect or copy the partnership books or records.

"(b) A transferee of a partner's transferable interest in the partnership has a right:

"(1) To receive, in accordance with the transfer, distributions to which the transferor would otherwise be entitled;

"(2) To receive upon the dissolution and winding up of the partnership business, in accordance with the transfer, the net amount otherwise distributable to the transferor; and

"(3) To seek, under subdivision (6) of section 34-372, a judicial determination that it is equitable to wind up the partnership business.

"(c) In a dissolution and winding up, a transferee is entitled to an account of partnership transactions only from the date of the latest account agreed to by all of the partners.

"(d) Upon transfer, the transferor retains the rights and duties of a partner other than the interest in distributions transferred.

"(e) A partnership need not give effect to a transferee's rights under this section until it has notice of the transfer.

"(f) A transfer of a partner's transferable interest in the partnership in violation of a restriction on transfer contained in the partnership agreement is ineffective as to a person having notice of the restriction at the time of transfer."

DiNardo and Leonard DiNardo]. [The decedent's] management and voting rights may not be transferred under this statutory scheme." The court therefore concluded, "[a]bsent the unanimous agreement of the partners . . . the [administrators] may transfer only [the decedent's] right to distributions from the partnership, subject to the reasonable consent requirements set forth in . . . the agreement."[8] The court noted that the reasonableness of the plaintiff's refusal to consent to the assignment, the scope and duration of the administrators' power and the plaintiff's claims that the administrators had acted improperly were issues to be determined at trial. Therefore, the trial court granted in part and denied in part the parties' cross motions in accordance with the foregoing conclusions.

Thereafter, a trial to the court ensued, which, as the court noted in its memorandum of decision, required it to address threshold questions of credibility of the key witnesses' testimony, as well as two issues of first impression under Connecticut law: (1) the reasonableness of the withholding of consent in the context of an assignment of an economic interest in a partnership; and (2) the expulsion of a partner pursuant to § 34-355 (5). With respect to the first issue, the trial court granted the administrators' request for a declaratory judgment that the plaintiff unreasonably had withheld his consent to the assignment of the decedent's interest from his estate to Peter DiNardo and Leonard DiNardo. The court concluded that the plaintiff's refusal had stemmed principally from his dislike of Salvatore DiNardo, who had engaged in some confrontations with the partnership's tenants and business associates since his appoint-

---

[8] The trial court expressly acknowledged that "an unworkable situation may result to the extent that the estate is left with interests in the partnership following trial" because "the [administrators] cannot control, and the estate cannot own, these interests in perpetuity." It noted that further application to the court could be necessary if these issues could not be resolved by agreement of the parties.

ment as administrator, and the plaintiff's concern as to the influence Salvatore DiNardo would have over his sons' conduct. The court found that the plaintiff's refusal to consent to the assignment was arbitrary, however, because the two sons had developed their own expertise and philosophy about business management. Therefore, it held that the decedent's estate could transfer the decedent's economic partnership interest to Peter DiNardo and Leonard DiNardo.

With respect to the second issue, the court granted the application of Aiello and Mihaly to expel the plaintiff from the partnership under § 34-355 (5) (C), and therefore did not consider whether dissociation was warranted under the other subparagraphs alleged. Among the evidence that the trial court relied on was the plaintiff's 1989 federal felony conviction for tax fraud. Because of the plaintiff's lack of candor with his partners about the basis for the conviction, his unwillingness before the court in the present action to recognize the depth and significance of his past wrongdoing, and his recent actions and acrimony toward the partners, including an unfounded accusation of insurance fraud, the court found that Aiello and Mihaly reasonably no longer felt that they could trust the plaintiff. In sum, the court concluded that, because the plaintiff no longer could do business with Aiello and Mihaly and vice versa, the appropriate remedy was dissociation of the plaintiff pursuant to § 34-355 (5) (C).

In addition to addressing the two issues raised in the defendants' counterclaims, the court denied the plaintiff's request for a permanent injunction to, inter alia, prohibit the defendants from taking any action to block his access to the partnership's records. See footnote 5 of this opinion. The court concluded that no partner had unlimited access to such records and that the partnership's established practice for obtaining access had proven satisfactory. The court further concluded that

the plaintiff had abandoned his claim seeking to have a receiver appointed.

The court subsequently requested that the parties file a joint statement of issues left to be resolved by the court. The parties took conflicting positions as to whether the court could finalize the judicial dissociation by proceeding with the valuation process for the plaintiff's interest in the partnership. The court thereafter issued a decision concluding that the partnership act set forth procedures by which only a dissociated partner could seek judicial relief to resolve the valuation process, not for the remaining partners to do so. The court further concluded that the plaintiff had not waived his statutory right to initiate a separate proceeding. Accordingly, the court concluded that it could afford no further relief on the defendants' claim for dissociation. The plaintiff's appeal and the defendants' cross appeal followed.[9]

In his appeal, the plaintiff claims that the trial court improperly granted the application by Aiello and Mihaly to expel the plaintiff from the partnership and improperly denied his request for a permanent injunction barring the defendants from blocking his access to the partnership records. In their cross appeal, the defendants contend, inter alia, that the trial court improperly concluded that it had no discretion as a court of equity to finalize the judicial dissociation by proceeding with the valuation process. See footnote 3 of this opinion.

I

We begin with the issue in the plaintiff's appeal as to whether the trial court properly granted the application by Aiello and Mihaly for the plaintiff's expulsion

---

[9] Although the administrators filed the cross appeal, Aiello and Mihaly joined them in submitting a single brief to this court both to respond to the plaintiff's appeal and to address the issues in the cross appeal. Therefore, we treat those defendants collectively in addressing the issues on appeal.

pursuant to § 34-355 (5) (C). That section permits the court to grant an application for expulsion if "the partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner . . . ." General Statutes § 34-355 (5) (C). The plaintiff first claims that expulsion is not authorized under § 34-355 (5) (C) for a long past, public conviction based on conduct unrelated to the partnership's business. He also claims that the trial court improperly relied on the conviction because the defendants never raised it in their pleadings and untimely raised it only four days before trial. We conclude that, in light of the totality of circumstances, including the plaintiff's past conviction as it related to the present events, the trial court properly ordered expulsion under § 34-355 (5) (C).

We begin with the procedural issue raised by the plaintiff as to whether his conviction could be considered when it had not been alleged by Aiello and Mihaly in their counterclaim as a basis for dissociation and was raised for the first time just before trial. The record reveals the following additional facts relevant to this claim. In a motion in limine dated April 24, 2006, the plaintiff sought to exclude evidence of his prior tax conviction, claiming that it was too remote in time and did not involve conduct so egregious as to warrant its admission as evidence to impeach his character. For reasons that are not entirely clear, the court deferred ruling on the admissibility of that evidence until ten days after the trial had commenced on May 1, 2006. In their opposition to the motion in limine dated April 27, 2006, the defendants brought to the court's attention the fact that, after deposing the plaintiff, they had obtained a copy of the record of the plaintiff's conviction, which revealed that he had misrepresented and minimized the true nature of his crime to the court in his motion in limine and to the defendants at the time

of the conviction. Although the plaintiff had represented that his conviction involved the deferral of reporting income from one year to the next, with no detriment to the government, the records of the conviction and the defendants' inquiries had revealed that the conviction involved the keeping of a double set of books and the failure to report $1 million in income.[10] The defendants therefore argued that the plaintiff's conviction not only was relevant for impeachment purposes but also for a separate and more important purpose, namely, their dissociation claim. Specifically, they contended that the fact that the plaintiff had lied to them, as well as to the court, and had been convicted of engaging in dishonest conduct undermined their ability to trust him, particularly now that he was in a position, for the first time, to control the partnership business.[11]

The plaintiff's memorandum in support of his motion in limine, filed shortly after the defendants' opposition, clearly reflects that he understood the defendants' intention to use the conviction both for impeachment purposes and as substantive evidence "to support their claim that [the plaintiff] should be ousted . . . ." The plaintiff objected to the use of this evidence solely on relevance grounds, not because it had not been alleged in the pleadings. Had the plaintiff made such an objection, it seems likely that the defendants would have

---

[10] The defendants also pointed out that, although the motion in limine simply referred to the years in which the illegal conduct had occurred, which preceded the formation of the partnership, the plaintiff was not charged and convicted until several years after the partnership had been formed.

[11] The defendants did not specify at that time whether the conviction was relevant to all or any one of the grounds alleged for dissociation, and the plaintiff apparently did not inquire about the specific grounds. At oral argument on the admission of this evidence on May 10, 2006, however, the defendants made it clear that they sought to use the conviction to support the claim "of an inability to work on an ongoing basis to the benefit of the partnership as a cause for dissociation," in other words, a claim under § 34-355 (5) (C).

sought leave to amend their counterclaim. See *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 368–69 n.2, 525 A.2d 68 (1987) ("The defendants did not raise with any specificity any issue in the trial court as to the failure of the pleadings to conform to the proof; and such an issue need not be reviewed here. . . . Furthermore, it is extremely likely that the court would have granted a motion to amend the pleadings had [the plaintiff] so moved." [Citations omitted.]). Even in the absence of an amendment, however, the trial court properly could have considered the issue as actually litigated. See *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 575, 715 A.2d 46 (1998) ("we have recognized that, even in the absence of such an amendment, where the trial court had in fact addressed a technically unpleaded claim that was actually litigated by the parties, it was improper for the Appellate Court to reverse the trial court's judgment for lack of such an amendment"). The plaintiff has not claimed that there was evidence that he would have produced had he had earlier notice of the defendants' intention. Accordingly, we reject the plaintiff's procedural objection to the use of his conviction.

Turning to the plaintiff's substantive claim as to the trial court's use of this evidence in concluding that dissociation was proper, the record reveals the following additional facts found by the court. Prior to addressing the question of whether the plaintiff should be dissociated from the partnership, the trial court made numerous factual findings relating to certain conflicts between the plaintiff and the defendants that had arisen since the decedent's death. First, the court addressed disputes over check signing authority, which had been limited under the partnership agreement to the plaintiff and the decedent. The court found that Aiello had signed checks for the partnership for two months following the decedent's death because of prob-

lems with the plaintiff's authorization, which thereafter were resolved. The court further found that the plaintiff had resisted the efforts by Aiello and Mihaly to vest Aiello with check signing authority to facilitate partnership business and by the administrators to exercise the decedent's check signing authority as they rightfully were entitled to do. The court found, in sum, that the plaintiff had "sought to maintain himself as the sole signatory to exercise individual control over the finances of the business" and had "engaged in a steady campaign of obstructing anything that he perceived to be the wishes of the DiNardos."

Next, the court addressed disputes over tenants and related issues. Although one of the retail tenants had complained about the manner in which Salvatore DiNardo had addressed the tenant when Salvatore DiNardo and Aiello came to the tenant's place of business, the court found that the plaintiff "[had] cultivated this witness to complain against [Salvatore] DiNardo, and in exchange [the plaintiff] forbore on the rent, so that [the tenant] was allowed to fall between $7000 and $12,000 behind in his rental payments." The court also pointed to other instances in which the plaintiff was unable to agree with the defendants about various decisions relating to partnership business.

Finally, the court addressed an accusation the plaintiff had levied against Aiello and Salvatore DiNardo, namely, that they falsely had inflated invoices submitted to the partnership's insurance company for water damage that had occurred at the partnership premises. The court found that the plaintiff never had produced any evidence to the court or to Aiello and Mihaly in support of this accusation. The court further found that the plaintiff had declined to follow Mihaly's suggestion to return the insurance payment if the plaintiff had evidence of such fraud, instead depositing the money in the partnership's account. Thus, the trial court found

that the plaintiff had created "an atmosphere of tension by inferring fraud and wrongdoing by a partner," despite a lack of proof.

Before turning to the question of the plaintiff's expulsion, the court also addressed the relevance of the plaintiff's 1989 tax fraud conviction. The trial court noted that the plaintiff had misrepresented the true nature and extent of his criminal conduct to his partners, both at the time of his conviction and during the course of the present litigation. The court further noted that the plaintiff had made similar misrepresentations to the court, with the additional claim that he had relied on the advice of his accountant when he engaged in the criminal conduct. Because the plaintiff had refused to acknowledge to the trial court in the present matter the full extent of this wrongdoing, the court concluded that the plaintiff "presently continues to be unable to recognize the depth of and significance of his wrongdoing. Therefore, the remoteness in time, which might normally be significant, is not here. It is unfair to ask partners to trust [the plaintiff] with their finances and decisions when his past significant culpable conduct regarding money in business matters is soft pedaled and rationalized to the present day."

The trial court thereafter turned to the issue of whether the standard for dissociation had been met. Although Aiello and Mihaly had alleged that dissociation was warranted under either subparagraphs (A), (B) or (C) of § 34-355 (5); see footnote 2 of this opinion; the trial court rested its conclusion on subparagraph (C), which, as we previously have noted, permits the court to grant an application for expulsion if "the partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner . . . ." General Statutes § 34-355 (5) (C). Because the concept of dissociation is a relatively new one under Connecti-

cut law, the court was guided in its decision by case law addressing the more established, and in its view analogous, standard for dissolution.

In concluding that the remedy of dissociation was warranted, the trial court made the following findings: "[T]he plaintiff's moral turpitude and criminal fraud, and failure to be honest in court as to the extent of his criminal wrongdoing constitutes conduct relating to the partnership business that makes it not reasonably practicable to carry on the business with the plaintiff. [Aiello and Mihaly] cannot trust [the plaintiff] with the finances of their [partnership]. When [the decedent] was alive it made no difference. Now, they are vulnerable to him, particularly in light of [the plaintiff's] veto power under the partnership agreement. Further, the court finds his challenge to the integrity of [Aiello's] conduct harmful to the healthy continuance of the partnership. [The plaintiff's] baseless claims of fraud remain; as Mihaly said, he has rung the bell and it cannot be unrung. [The plaintiff] himself when he sought to make himself receiver pendente lite showed naked ambition to control the partnership, contrary to the terms of the agreement.

"In light of the animosity that [the plaintiff] harbors toward his partners, his distrust of them (which distrust is mutual) and his suspicion that [Aiello] committed a fraud, it is not reasonably practicable for him to carry on business with them. The court finds that [Aiello and Mihaly] gave [the plaintiff] the benefit of every consideration in his lease dealings and his check writing. He has rewarded them with nothing but suspicion and acrimony. Moreover, the partnership has reached an impasse regarding important business issues because of [the plaintiff's] veto power. The court finds that [Aiello and Mihaly] have proven that it is deleterious to the partnership for [the plaintiff] to remain as their partner under [§ 34-355 (5) (C)].

"The court finds that [the plaintiff's] failure to be fully open and honest about his past criminal conduct results in an irreconcilable distrust of him by [Aiello and Mihaly] and an inability to consider him to be trustworthy as an active participating partner in the advent of the partnership after [the decedent's] death.

"In sum, it is clear that [the plaintiff] can no longer do business with his colleagues, and vice versa. The court finds that [the plaintiff's] conduct, as detailed hereinabove, is a major cause for the dissension and acrimony among the partners. While the court appreciates [the plaintiff's] frustration over some of Salvatore DiNardo's actions, that frustration cannot suffice to explain or justify [the plaintiff's] reprehensible conduct in dealing with [Aiello and Mihaly]. The appropriate remedy under these circumstances is the dissociation of [the plaintiff] pursuant to . . . § 34-355 (5) (C)."

The crux of the plaintiff's challenge to the trial court's conclusion is that the grounds for his expulsion were improper under § 34-355 (5) (C) because: (1) his conviction was not "conduct *relating to* the partnership" under that statute; (emphasis added); and (2) although the inability of one partner to work with the other partners because of acrimony and mistrust that has developed can be a proper basis for *dissolution,* it is not a proper basis for *dissociation* of the one partner who is the source of these problems. We disagree.

Before turning to the merits of this argument, we note that the plaintiff has not challenged the propriety of any of the trial court's underlying factual findings. Rather, he challenges the meaning of the standard for dissociation set forth under § 34-355 (5) (C) and whether the facts found satisfy this standard. To the extent that the plaintiff's claim requires construction of the statute, it raises a question of law, "over which we exercise plenary review. . . . The process of statutory

interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply." (Internal quotation marks omitted.) *State* v. *Peters*, 287 Conn. 82, 87–88, 946 A.2d 1231 (2008); see General Statutes § 1-2z (allowing resort to extratextual sources only when text does not have plain meaning or when such plain meaning would yield unworkable or absurd result). To the extent, however, that the plaintiff contends that the trial court properly could not have concluded that his conduct made it "not reasonably practicable to carry on the business in partnership with [him]"; General Statutes § 34-355 (5) (C); we review this determination for an abuse of discretion. See *Horning* v. *Horning Construction, LLC*, 12 Misc. 3d 402, 411, 816 N.Y.S.2d 877 (2006) (reasonably practicable determination matter of discretion); *Boardman* v. *Lovett Enterprises, Inc.*, 288 S.C. 387, 392, 342 S.E.2d 634 (App. 1986) ("[d]issolution is discretionary with the trial court and depends on the particular facts of a case").

We would agree with the plaintiff that, had the trial court based its decision to expel him *solely* on his 1989 conviction and the defendants' recent discovery of the actual nature of the conviction, such a ground might be too attenuated to constitute "conduct *relating to* the partnership business . . . ." (Emphasis added.) General Statutes § 34-355 (5) (C). Although the term "relating to" uniformly has been given a broad meaning,[12] a

[12] Numerous courts have cited to the definition of the term relating to set forth by the United States Supreme Court in *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 119 L. Ed. 2d 157 (1992), wherein that court looked to the dictionary to determine that "[t]he ordinary meaning of [relating to] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' Black's Law Dictionary 1158 (5th [E]d. 1979) . . . ." See, e.g., *Desai* v. *Mukasey*, 520 F.3d 762, 764 (7th Cir. 2008); *United States* v. *Weis*, 487 F.3d 1148, 1152 (8th Cir. 2007); *Yong Wong Park* v. *Attorney General*, 472 F.3d 66, 72 (3d Cir. 2006); *In re Marriage of Ikeler*, 161 P.3d 663, 673 (Colo. 2007); *Central States Foundation* v. *Balka*, 256 Neb. 369, 374, 590 N.W.2d

recent discovery by partners of a past lie regarding past conduct concerning an unrelated enterprise likely would not meet this standard. We disagree, however, with the plaintiff's characterization of the trial court's reliance on his criminal conviction.

Although the plaintiff views the court's reliance on his conviction in isolation, our review of its decision demonstrates that the court incorporated this fact into a broader mosaic. Read in context, the court clearly found the conviction as relating to the partnership's business because of several *current* factors. First, since the decedent's death, the plaintiff had engaged in a pattern of adversarial conduct with Aiello and Mihaly that had caused them to mistrust him, including besmirching Aiello's reputation with a false accusation of fraud. Second, the decedent's death had placed the plaintiff in a position of control over the partnership that he previously had not enjoyed, and the plaintiff thereafter engaged in conduct to maintain such control to the exclusion of everyone else. Although, at oral argument to this court, the plaintiff contended that actions such as seeking to preclude others from obtaining check signing authority were simply an attempt to maintain the "status quo," the status prior to the decedent's death was that this authority was not exclusive to the plaintiff. Moreover, it is ironic that the plaintiff claimed to be seeking to protect the status quo when, according to Aiello and Mihaly, it was the plaintiff who wanted to make substantial changes in the way the partnership was being conducted. Third, the plaintiff was not fully forthcoming about his conviction, either to the court or to the defendants, when con-

832 (1999); see also *Mizrahi* v. *Gonzales*, 492 F.3d 156, 159 (2d Cir. 2007) ("use of the phrase 'relating to' in federal legislation generally signals its expansive intent"); *Lombardo's Ravioli Kitchen, Inc.* v. *Ryan*, 268 Conn. 222, 233, 842 A.2d 1089 (2004) (" '[R]elated' is defined as 'having relationship: connected by reason of an established or discoverable relation . . . .' Webster's Third New International Dictionary.").

fronted in the present proceedings with the belated discovery by Aiello and Mihaly of the true nature of the conviction.[13] In sum, although the plaintiff's 1989 conviction, standing alone, might not constitute conduct relating to the partnership that would warrant his dissociation, it properly could inform the court's view of the plaintiff's current conduct relating to the partnership as to whether Aiello and Mihaly's mistrust was justified and whether the plaintiff's explanations as to his intent were credible. Such factors undoubtedly were relevant to whether the acrimony was so pervasive and entrenched that dissociation was warranted.

The case law cited by the trial court in support of its decision, as well as that submitted to this court by the defendants and revealed in our independent research, confirms that an irreparable deterioration of a relationship between partners is a valid basis to order dissolution, and, therefore, is a valid basis for the alternative remedy of dissociation.[14] The plaintiff has proffered no

---

[13] We note that the plaintiff also has contended that the trial court could not rely on Aiello and Mihaly's recent discovery that the plaintiff had minimized the nature and extent of his criminal conduct at the time of the conviction because, given that the actual facts relating to the offense and his conviction were a matter of public record and, indeed, the subject of newspaper articles, he could not be deemed to have concealed those facts. We outright reject this contention. We note that there is no evidence that Aiello and Mihaly had seen these articles. The plaintiff apparently faults Aiello and Mihaly for: (1) believing him; and (2) failing to scour the newspapers for accounts of the trial. What the plaintiff overlooks is that it is *his* conduct at issue, not that of Aiello and Mihaly. Moreover, it is apparent to us that the trial court properly concluded that the plaintiff had misrepresented the nature of his past conduct to the court in the present case.

[14] See *Bertolla* v. *Bill*, 774 So. 2d 497, 503 (Ala. 1999) (Citing the following evidence when concluding that the trial court properly ordered dissolution on the ground that "it was 'not reasonably practicable' for them to remain in partnership . . . . Every witness who was asked whether [the partners] could continue in partnership with each other answered that they could not. It is well settled that partners who cannot interact with each other should not have to remain bound together in partnership." [Citation omitted.]); *Tembrina* v. *Simos*, 208 Ill. App. 3d 652, 658, 567 N.E.2d 536 (concluding that dissolution was proper in light of findings that "animosity existed between the partners and that they were unwilling to cooperate with each

case law to the contrary. Rather, the plaintiff asserts

other" and "actions of one of the partners in causing the partnership property to be conveyed into his individual name, the partners' failure to pay their share of real estate taxes, and one partner's action in absenting himself from the country"), appeal denied, 139 Ill. 2d 605, 575 N.E.2d 924 (1991); *Ferrick v. Barry*, 320 Mass. 217, 222, 68 N.E.2d 690 (1946) (Dissolution was proper on the ground that a partner " 'conducts himself in matters relating to the partnership business [and] that it is not reasonably practicable to carry on the business in partnership with him' " when: "The conduct of [the plaintiff partner] had brought about a situation in which the business could no longer be carried on jointly in the manner contemplated by the articles of copartnership. The other partners were not required to submit to [the plaintiff's] domination or to continue in an atmosphere of non-cooperation, suspicion, and distrust, even though [the plaintiff] was not actually dishonest, and even though substantial profits were being made. An enterprise organized on the principle of equality in proprietorship and management cannot be expected to realize its aims under such conditions."); *Nupetco Associates v. Jenkins*, 669 P.2d 877, 883 (Utah 1983) (concluding that trial court properly concluded that neither party had breached partnership agreement despite determination that remedy of dissolution was warranted in light of facts that partners disagreed as to method of managing partnership affairs and lacked confidence in each other such that "[i]t is not reasonably practicable for the parties to carry on the partnership business because of the dissension between the partners" [internal quotation marks omitted]); see also *Cobin v. Rice*, 823 F. Sup. 1419, 1426 (N.D. Ind. 1993) (Finding that the partnership should be dissolved on the general equitable ground when "[t]he plaintiffs have presented sufficient evidence of ill-will, dissension, and antagonism between the partners to prove that the partners are unable to carry on the [p]artnership business to their mutual advantage. . . . Accordingly, as the [p]artnership business requires cooperation and harmony between the partners, which is clearly lacking, equitable dissolution of the [p]artnership is appropriate."); *Owen v. Cohen*, 19 Cal. 2d 147, 152, 119 P.2d 713 (1941) ("[C]ourts of equity may order the dissolution of a partnership where there are quarrels and disagreements of such a nature and to such extent that all confidence and cooperation between the parties has been destroyed or where one of the parties by his misbehavior materially hinders a proper conduct of the partnership business. It is not only large affairs which produce trouble. The continuance of overbearing and vexatious petty treatment of one partner by another frequently is more serious in its disruptive character than would be larger differences which would be discussed and settled. For the purpose of demonstrating his own preeminence in the business one partner cannot constantly minimize and deprecate the importance of the other without undermining the basic status upon which a successful partnership rests. In our opinion the court in the instant case was warranted in finding from the evidence that there was very bitter, antagonistic feeling between the parties; that under the arrangement made by the parties for

that, because dissociation connotes wrongdoing by the ousted partner, whereas dissolution does not, the ground for dissociation provision in § 34-355 (5) (C) should be construed more strictly. We disagree.

Under the partnership act, one of the grounds for dissolution is identically worded to the ground in § 34-355 (5) (C), namely, that "another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner . . . ." General Statutes § 34-372 (5) (B).[15] Thus, there is no textual basis for imposing a higher burden of proof for dissociation than dissolution. See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 123, 830 A.2d 1121 (2003) ("[i]t is a 'familiar principle of statutory construction that where the same words are used in a statute two or more times they will ordinarily be given the same meaning in each instance' "); 2B J. Sutherland, Statutory Construction (5th Ed. Singer

the handling of the partnership business, the duties of these parties required cooperation, coordination and harmony; and that under the existent conditions the parties were incapable of carrying on the business to their mutual advantage."); *Clement* v. *Clement*, 436 Pa. 466, 468, 260 A.2d 728 (1970) ("One should not have to deal with his partner as though he were the opposite party in an arms-length transaction. One should be allowed to trust his partner, to expect that he is pursuing a common goal and not working at cross-purposes."); *Warnick* v. *Warnick*, 76 P.3d 316, 322 (Wyo. 2003) (concluding that dissociation was proper remedy when, inter alia, partner who was dissociating had conceded that reconciliation among partners was not realistic possibility).

[15] General Statutes § 34-372 provides in relevant part: "A partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events . . .

"(5) On application by a partner, a judicial determination that: (A) The economic purpose of the partnership is likely to be unreasonably frustrated; (B) another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or (C) it is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement . . . ."

1992) § 51.02, p. 122 (identical words or phrases used in related statutes given same meaning unless contrary intent appears). We also note that there is nothing in the history of, or policy underlying, these provisions to support the distinction proposed by the plaintiff. Prior to Connecticut's adoption of our partnership act, which was modeled on the Revised Uniform Partnership Act of 1997 (revised partnership act), 6 U.L.A., Pt. 1 (2001), the sole mechanism for relief under the present circumstances would have been for Aiello and Mihaly to obtain a dissolution of the partnership, which in turn would have left them free to reformulate a new partnership without the plaintiff. Under the partnership act, a partnership now has a choice, either to dissolve the partnership or to seek the dissociation of a partner who has made it not reasonably practicable to carry on the partnership with him. The new remedy of dissociation permits a financially viable partnership to remain intact without dissolving the partnership and reconstituting it. As the commentary to the revised partnership act notes: "[The revised partnership act] dramatically changes the law governing partnership breakups and dissolution. An entirely new concept, 'dissociation,' is used in lieu of the [partnership act] term 'dissolution' to denote the change in the relationship caused by a partner's ceasing to be associated in the carrying on of the business." Rev. Unif. Partnership Act of 1997, § 601, comment (1), 6 U.L.A., Pt. 1, p. 164 (2001); see id., comment (6) (noting that conduct that satisfies ground at issue in this case also may satisfy same ground under dissolution provision).[16] We, therefore, conclude that

---

[16] The commentary to the revised partnership act further explains: "Under [the revised partnership act], unlike the [partnership act], the dissociation of a partner does not necessarily cause a dissolution and winding up of the business of the partnership. Section 801 identifies the situations in which the dissociation of a partner causes a winding up of the business. Section 701 provides that in all other situations there is a buyout of the partner's interest in the partnership, rather than a windup of the partnership business. In those other situations, the partnership entity continues, unaffected by the partner's dissociation.

the trial court properly considered the conviction in connection with the plaintiff's conduct relating to the partnership and properly determined that, under all of the circumstances, the plaintiff's dissociation was an appropriate remedy.

## II

We next turn to the plaintiff's claim that the trial court improperly denied his request for a permanent injunction barring the defendants from blocking his access to the partnership records.[17] The plaintiff contends that the trial court's conclusion was contrary to his statutory right to access those records under General Statutes § 34-337, under which he contends the only limitations that can be imposed are the time of day to access such records—ordinary business hours— and the cost of copying records—a reasonable cost. Specifically, he contends that the trial court's reliance on the partnership's customary practice for providing access improperly limited his statutory right to full and unfettered access. We disagree.

The record reveals the following additional undisputed facts, as found by the trial court and as evidenced in the record. The plaintiff alleged in his complaint that, "[p]rior to the appointment of the DiNardos as coadministrators, Lehn and/or the DiNardos denied [the plaintiff] reasonable access to the books and records of [the partnership], which are maintained at a property formerly owned by [the decedent]." The trial court found that there had been a well established procedure

"A dissociated partner remains a partner for some purposes and still has some residual rights, duties, powers, and liabilities." Rev. Unif. Partnership Act of 1997, supra, § 601, comment (1).

[17] As we explain later in this part of the opinion, the statutory right to access partnership records extends to former partners. Accordingly, this claim is not rendered moot by our conclusion in part I of this opinion that the trial court properly ordered the application to expel the plaintiff from the partnership.

for accessing partnership records that had proven satisfactory to all the partners, including the plaintiff, prior to the decedent's death. Under this practice, the bookkeeper for all of the decedent's business interests had maintained the files in cabinets to which only she had access. No partner was permitted to peruse through the cabinets. Instead, the bookkeeper would pull any file requested or that was applicable to the information sought by the partner, the partner would review the file, and the bookkeeper would make copies of any documents that the partner wanted.

In examining the plaintiff's claim, the trial court did not find that there was any particular circumstance in which the plaintiff had sought, and been denied, access to files. Rather, the court characterized the plaintiff's complaint to be that: (1) he wanted access to the cabinets so he could peruse through them to determine what he was interested in; and (2) he believed that Aiello, Peter DiNardo and Leonard DiNardo had personal access to the cabinets. The court rejected the first argument on the ground that it was contrary to the well established, and heretofore satisfactory, practice applicable to all of the partners. The court further found "no basis in the record for one partner, the plaintiff or any other, to distrust the evenhandedness of the bookkeeper in dealing with each of them." The court rejected the second argument as unsupported by the evidence.

We are mindful of "the governing principles for our standard of review as it pertains to a trial court's discretion to grant or [to] deny a request for an injunction: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an

erroneous statement of law or an abuse of discretion."[18] (Internal quotation marks omitted.) *Tighe* v. *Berlin*, 259 Conn. 83, 87, 788 A.2d 40 (2002). To the extent, however, that the plaintiff claims that the trial court's conclusion conflicts with his right to access under § 34-337 (b), as we have noted in part I of this opinion, the construction of a statute is a question of law subject to plenary review.

Section 34-337 (b) provides: "A partnership shall provide partners and their agents and attorneys access to its books and records. It shall provide former partners and their agents and attorneys access to books and records pertaining to the period during which they were partners. The right of access provides the opportunity to inspect and copy books and records during ordinary business hours. A partnership may impose a reasonable charge, covering the costs of labor and material, for copies of documents furnished." We note at the outset that the statute does not provide for unfettered access. Nor does it state that the only limitations that may be imposed are on the hours in which the records shall be made available. Rather, it simply requires that the partner be provided an "opportunity" to access the records. Indeed, a related statute indicates that partnership agreements may impose reasonable restrictions on access. See General Statutes § 34-303 (b) (2).[19]

---

[18] The plaintiff contends that he need not show irreparable harm when seeking review of a ruling denying an order to enjoin a statutory violation. We disagree. The plaintiff cites to cases in which the party seeking injunctive relief is relieved of the normal burden of proving irreparable harm because the statute has authorized injunctive relief. See, e.g., *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 532–33, 686 A.2d 481 (1996); *Conservation Commission* v. *Price*, 193 Conn. 414, 429, 479 A.2d 187 (1984); *Greenwich* v. *Kristoff*, 2 Conn. App. 515, 521, 481 A.2d 77, cert. denied, 194 Conn. 807, 483 A.2d 275 (1984).

[19] General Statutes § 34-303 provides in relevant part: "(a) Except as otherwise provided in subsection (b) of this section, relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, sections 34-300 to 34-399, inclusive, govern relations among the partners and between the partners and the partnership.

The trial court's unchallenged findings in the present case as to the well established nature of the practice for providing access to records and the satisfaction of all the partners with this practice demonstrates its reasonableness. See 59A Am. Jur. 2d 267, Partnership § 116 (2003) ("A partnership contract may be enlarged by implication from the general usage and habit of the firm, with the acquiescence of all partners. However, even assuming the existence of a custom or usage in a particular type of enterprise, its effect is not to establish that parties to a partnership agreement lack the rights of partners merely because they may have failed to exercise those rights, since the negative fact that a partnership right is not exercised does not establish the affirmative conclusion that it cannot be exercised or does not exist.").

We further note the complete absence of evidence of irreparable harm. The partnership instituted a procedure for keeping the records organized so that access readily could be obtained. The mere fact that the plaintiff must make a request to have a third party pull the files and, in turn, hand them over to him does not impair his right of access in any cognizable manner. The plaintiff has proffered no evidence that this procedure in any way limits his ability to obtain necessary information. Nor does he dispute the trial court's finding that the bookkeeper treated all of the partners equally in providing access. Accordingly, he also has failed to demonstrate irreparable harm, as he must in order to prove his right to injunctive relief. *Tighe* v. *Berlin*, supra, 259 Conn. 87.

---

"(b) The partnership agreement may not . . .

"(2) *Unreasonably* restrict the right of access to books and records under subsection (b) of section 34-337 . . . ." (Emphasis added.) See also General Statutes §§ 34-13c and 34-144 (c) (referring to "reasonable request" for records).

III

Finally, we consider the defendants' cross appeal as it relates to the last issue pertaining to the plaintiff's partnership interest. Specifically, the defendants contend that the trial court improperly determined that General Statutes § 34-362[20] prevented it from exercising its discretion as a court of equity to finalize the judicial dissociation by proceeding with the valuation process for the plaintiff's partnership interest. The defendants contend that, notwithstanding the provision affording a right of action only to a dissociated partner pursuant to § 34-362 (i), the trial court's equitable powers gave

---

[20] General Statutes § 34-362 provides in relevant part: "(a) If a partner is dissociated from a partnership without resulting in a dissolution and winding up of the partnership business under section 34-372, the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price determined pursuant to subsection (b) of this section.

"(b) The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subsection (b) of section 34-378 if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment. . . .

"(e) If no agreement for the purchase of a dissociated partner's interest is reached within one hundred twenty days after a written demand for payment, the partnership shall pay, or cause to be paid, in cash to the dissociated partner the amount the partnership estimates to be the buyout price and accrued interest, reduced by any offsets and accrued interest under subsection (c) of this section. . . .

"(i) A dissociated partner may maintain an action against the partnership, pursuant to subparagraph (B) of subdivision (2) of subsection (b) of section 34-339, to determine the buyout price of that partner's interest, any offsets under subsection (c) of this section or other terms of the obligation to purchase. The action must be commenced within one hundred twenty days after the partnership has tendered payment or an offer to pay or within one year after written demand for payment if no payment or offer to pay is tendered. The court shall determine the buyout price of the dissociated partner's interest, any offset due under subsection (c) of this section and accrued interest, and enter judgment for any additional payment or refund. . . ."

it the authority to "[fashion] orders so as to afford both the dissociated plaintiff and his former partners the equivalent rights as granted by [§] 34-362 et seq." The plaintiff contends that, because he has the right to initiate a separate action under § 34-362, the trial court had no discretion to continue to exercise jurisdiction while this appeal was pending in order to conduct a valuation proceeding. We agree with the plaintiff.

As we previously have noted, the court rendered judgment on the plaintiff's complaint and the defendants' counterclaims without conducting the valuation process, concluding that there was no further relief it could afford the defendants. Specifically, the trial court concluded that, because the plaintiff had not waived his rights under § 34-362, the law governing partnership valuations in the wake of a judicial dissociation under that provision controlled and the court was not authorized to afford the defendants relief on their claim for valuation of the plaintiff's partnership interest.

The trial court's determination that § 34-362 precluded its ability to engage in a valuation assessment was an issue of statutory construction requiring a conclusion of law. As we previously have noted, as with any question of statutory construction, our review is plenary; State v. Bletsch, 281 Conn. 5, 16, 912 A.2d 992 (2007); and we adhere to fundamental principles of statutory construction. See General Statutes § 1-2z; Testa v. Geressy, 286 Conn. 291, 308, 943 A.2d 1075 (2008) ("[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature" [internal quotation marks omitted]). One such principle that is relevant to this issue is that "the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a

statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *In re William D.*, 284 Conn. 305, 313, 933 A.2d 1147 (2007).

Section 34-362 provides a specific procedure for the valuation of a dissociated partner's interest. If the parties do not reach an agreement on the valuation by a specified method within a specified period, § 34-362 (i) expressly affords a *dissociated partner* the right to maintain an action against the partnership "to determine the buyout price of that partner's interest . . . or other terms of the obligation to purchase" pursuant to General Statutes § 34-339 (b) (2) (B). There is no comparable provision under § 34-362 for a court action by the remaining partners.

Turning to § 34-339 (b), that section provides in relevant part: "*A partner may maintain an action against the partnership* or another partner for legal or equitable relief, with or without an accounting as to partnership business, *to . . . (2) Enforce the partner's rights under sections 34-300 to 34-399, inclusive, including . . . (B) the partner's right on dissociation to have the partner's interest in the partnership purchased pursuant to section 34-362 . . . .*" (Emphasis added.) By contrast, subsection (a) of that statute only provides: "A partnership may maintain an action against a partner for a breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership." General Statutes § 34-339 (a). Thus, there is no statutory basis for the defendants to compel a valuation proceeding at this stage. Indeed, as the trial court aptly noted, "it is clear that a dissociated partner was to be protected in the buy out procedure from the control of the remaining partners and partnership."

The defendants nevertheless contend that the court had *equitable* powers to afford both the partnership as

well as the dissociated partner equivalent rights with respect to the valuation. The defendants overlook the mandate, however, of General Statutes § 34-303. That statute provides in relevant part: "Except as otherwise provided in subsection (b) of this section, relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, sections 34-300 to 34-399, inclusive, govern relations among the partners and between the partners and the partnership." General Statutes § 34-303 (a). Had the partners wanted to provide a right of action for the partnership to compel a valuation of a dissociated partner's interest, they could have done so. It is undisputed that the partnership agreement in the present case did not include a provision authorizing the partnership to initiate such an action.

In the absence of such a provision and in light of the detailed protections in the partnership act for the dissociated partner, the defendants' proposed common-law equitable remedy would conflict with the purpose of the partnership act. See *Thibodeau* v. *Design Group One Architects, LLC,* 260 Conn. 691, 709, 802 A.2d 731 (2002) (concluding that legislative decision to impose liability on employers above specified size for sex discrimination claims indicates intent not to allow courts to impose liability on employers below specified size). "[W]hen the . . . [statute] articulating a public policy also includes certain substantive limitations in scope or remedy, these limitations also circumscribe the common law . . . ." (Internal quotation marks omitted.) Id., 710. It is clear, by virtue of the detailed procedure and court remedy directed at the behest of the dissociated partner under the partnership act, that the legislature has intended for the dissociated partner to control the timing and procedure by which the valuation process occurs. Therefore, pursuant to the partnership act,

only the dissociated partner may bring an action to compel valuation. Accordingly, we conclude that the trial court properly concluded that general principles of equity did not authorize the trial court to afford the defendants relief on their request for a valuation proceeding.

The judgment is affirmed.

In this opinion the other justices concurred.