Richardson's conviction and sentence. We remand the cause to the Court of Appeals with directions to reverse Richardson's conviction and sentence and to remand the cause to the district court for a new trial.

Reversed and remanded with directions.

---

James E. Robertson et al., appellants and cross-appellees,
v. Jacobs Cattle Company, a partnership, et al.,
appellees and cross-appellants.

___ N.W.2d ___

Filed May 10, 2013.    No. S-12-370.

1. **Partnerships: Accounting: Appeal and Error.** An action for a partnership dissolution and accounting between partners is one in equity and is reviewed de novo on the record.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations. But when credible evidence is in conflict on material issues of fact, an appellate court considers and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another.
3. **Statutes.** Statutory interpretation presents a question of law.
4. **Partnerships.** The interpretation of a partnership agreement presents a question of law.
5. **Judgments: Appeal and Error.** An appellate court independently reviews a lower court's rulings on questions of law.
6. **Partnerships: Time.** The Uniform Partnership Act of 1998 applies to any Nebraska partnership, including those formed prior to January 1, 1998.
7. **Partnerships.** Under the Revised Uniform Partnership Act, the dissociation of a partner does not necessarily cause a dissolution and winding up of the partnership's business. Generally, the partnership must be dissolved and its business wound up only upon the occurrence of one of the events listed in § 801 of the Revised Uniform Partnership Act, upon which Neb. Rev. Stat. § 67-439 (Reissue 2010) is based.
8. ____. Where a court determines that the conduct of one or more partners constitutes grounds for dissociation by judicial expulsion under Neb. Rev. Stat. § 67-431(5)(c) (Reissue 2010) and dissolution under Neb. Rev. Stat. § 67-439(5)(b) (Reissue 2010), and there are no other grounds for dissolution, the court may in its discretion order either dissociation by expulsion of one or more partners or dissolution of the partnership.
9. **Statutes: Appeal and Error.** The language of a statute is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

10.  **Partnerships: Words and Phrases.** The phrase "date of dissociation" as used in
     Neb. Rev. Stat. § 67-434(2) (Reissue 2010) refers to the date of the event which
     resulted in the dissociation.

Appeal from the District Court for Valley County: Karin
L. Noakes, Judge. Affirmed in part as modified, and in part
reversed and remanded for further proceedings.

Patrick J. Nelson, of Law Office of Patrick J. Nelson,
L.L.C., for appellants.

David A. Domina and Jason B. Bottlinger, of Domina Law
Group, P.C., L.L.O., and Gregory G. Jensen for appellees.

Connolly, Stephan, McCormack, and Cassel, JJ.

Stephan, J.
Jacobs Cattle Company is a family partnership which owns
agricultural land in Valley County, Nebraska. Four of its six
partners sought dissolution and liquidation of the partnership.
One of the other two partners then sought a judicial dissocia-
tion of those four partners. The district court refused to dis-
solve and liquidate the partnership, but it dissociated the four
partners and ordered that the partnership buy out their interests
in the partnership. In this appeal, the four partners (collectively
appellants) contend the district court erred in not dissolving
the partnership and further erred in determining the proper
buyout price. The other two partners and the partnership cross-
appeal, contending the court erred in determining the date of
asset valuation. We conclude that dissociation was proper, but
reverse, and remand for recalculation of the buyout price and
imposition of the proper rate of interest.

## I. FACTS

Jacobs Cattle Company is a family partnership that was
formally organized on January 1, 1979. The original partners
were Leonard Jacobs and his wife, Ardith Jacobs; their chil-
dren Dennis Jacobs, Duane Jacobs, and Patricia Robertson;
and the respective spouses of those children, Debbie Jacobs,
Carolyn Sue Jacobs, and James E. Robertson. At some point,
Debbie withdrew from the partnership and Dennis acquired
her interest.

Leonard died in March 1997. Probate proceedings determined that his capital interest in the partnership at the time of his death was 34 percent.

### 1. Partnership Agreement

The operative partnership agreement became effective on June 19, 1997. The partners were identified as Ardith, in her capacity as trustee of the Leonard Jacobs Family Trust and in her capacity as trustee of the Ardith Jacobs Living Revocable Trust; Duane; Carolyn; Patricia; James; and Dennis.

Pertinent provisions of the agreement include the following:

4. <u>TERM</u>

. . . This Partnership shall continue until terminated by mutual agreement, operation of law or as hereinafter provided.

. . . .

7. <u>MANAGEMENT</u>

Ardith Jacobs, Trustee of the Ardith Jacobs Living Revocable Trust shall have general management authority to conduct day to day business on behalf of the Partnership, and Ardith Jacobs shall have the authority to bind the Partnership; provided however, a vote of 6 Partners shall have authority to override a decision made by Ardith Jacobs. Votes can be cast by Partners as follows: [Ardith and Dennis each have two votes; Patricia, James, Duane, and Carolyn each have one vote.]

Matters that cannot be agreed upon shall be submitted to Arbitration as established hereinbelow.

. . . .

11. <u>PROFITS AND LOSSES</u>

The net profits and net losses of the Partnership shall be distributable or chargeable, as the case may be, to each of the Partners in proportion to the votes they have herein as set forth in paragraph 7. The term "net profits" and "net losses" shall mean the net profits and net losses of the Partnership as determined by generally accepted accounting principles. . . .

. . . .

17. <u>QUARTERLY MEETING</u>

A quarterly meeting of all Partners shall be held on the first Monday following the close of the preceding quarter. The purpose of the meeting is to discuss business operations, profits, losses, capital accounts, income accounts, and all other Partnership business. . . .

. . . .

19. MISCELLANEOUS

. . . .

(c) . . . . The books of account shall be examined, and reviewed as of the close of a fiscal year by a Certified Public Accountant agreeable to all Partners, who shall make a report thereon.

## 2. Partnership Business

The partnership owns approximately 1,525 acres of land in Valley County. The land is mostly farmland and pasture and is unencumbered. A real estate appraiser valued the land as of January 1, 2011, at $4,545,000, and as of September 20, 2011, at $5,135,000. The $590,000 increase in appraisal value represented a 12.98 percent increase, which when annualized amounted to an 18.02 percent increase.

The partnership rented its land to others. Patricia and James, Dennis, and Duane and Carolyn all rented land from the partnership, although James did not sign a lease. At least some of the land was rented for less than its fair rental value.

Since June 19, 1997, the partnership has not returned a profit and there have been no distributions of net profits to the partners. Since Leonard's death, no partner has contributed new land or capital to the partnership.

## 3. Partnership Issues

In July 2004, the attorney for the partnership sent a letter to the partners informing them that none of the tenants had paid their rent for 2004. There were no partnership meetings after January 2005. In late 2004 or early 2005, Ardith terminated the services of Robert D. Stowell as the attorney for the partnership. In April 2005, Ardith retained a new attorney for the partnership. In 2005, Ardith terminated the services of Mick Puckett as the accountant for the partnership and hired a new

accountant. Puckett was the last certified public accountant agreeable to all of the partners, and Stowell was the last attorney agreeable to all partners.

In March 2005, Dennis and Patricia were involved in a physical altercation. As a result, Dennis pled no contest to criminal assault charges. On April 28, Patricia and James were served with a notice to quit the leased premises for nonpayment of rent. Around the same time, Duane was also notified that he needed to quit the premises he was leasing due to nonpayment of rent. Duane eventually paid his rent, but on May 4, the partnership sued Patricia and James for rents due for the years 2003 and 2004. Ardith alone made the decision to file the lawsuit. On August 11, a court entered judgment against Patricia for unpaid rent. The court did not enter judgment against James because his name was not on the lease. The land which the partnership had leased to Patricia was later rented to Dennis.

## II. PROCEDURAL HISTORY

### 1. Pleadings

In July 2007, appellants filed the operative amended complaint for dissolution of the partnership against the partnership, Ardith, and Dennis (collectively appellees). The complaint sought a dissolution and winding up of the partnership under the Uniform Partnership Act of 1998[1] (1998 UPA). Appellees filed an answer in September. A December 2010 amended answer and counterclaim, styled as an amended cross-claim, alleged that dissociation of appellants, not dissolution of the partnership, was the proper remedy.

### 2. September 20, 2011, Interlocutory Order

After conducting a bench trial, the district court entered an order on September 20, 2011. The court concluded that appellants did not prove the occurrence of events authorizing dissolution under § 67-439(5) because (1) nothing had occurred to interfere with the partnership's ability to buy, own, and rent

---

[1] Neb. Rev. Stat. §§ 67-401 to 67-467 (Reissue 2009).

land; (2) no partners took steps to override decisions made by Ardith and "[j]ust because a partner does not like the decision of the managing partner does not make it impracticable to continue the partnership with that partner"; and (3) Ardith had not acted beyond the partner restrictions specified in the partnership agreement. The court reasoned that nothing had occurred to make the partnership agreement difficult or impossible with which to comply, and it dismissed appellants' dissolution claims.

However, the court found that appellants' failure to pay rent in a timely manner supported appellees' request that appellants be dissociated from the partnership under § 67-431(5)(a) and (c). The court reasoned that because the primary purpose of the partnership was to rent land, appellants' delinquency in paying rent materially and adversely affected the partnership business and made it not practicable for the partnership to carry on with appellants as partners. The court thus ordered dissociation of appellants by judicial expulsion pursuant to § 67-431(5)(a) and (c) and ordered the partnership to purchase appellants' interests in the partnership as required by § 67-434. The court specifically ordered the parties to prepare buyout proposals and found that the value of partnership assets was "to be determined as of the date of the dissociation, which is the date this judgment is filed."

### 3. Final Judgment

On November 4, 2011, the partnership filed a buyout proposal with the district court. The proposal set out the value of the partnership based on its assets and liabilities, including the value of the appreciated land, and then proposed that each appellant be paid $275,941.96. Although the proposal did not contain mathematical calculations, it stated that this sum represented each appellant's "equal partnership fractional interest." This mathematically equates to each appellant's 5.33 percent capital account ownership.

Appellants filed written objections to the proposed buyout on December 5, 2011. One objection was that the proposed buyout did not "contain either (a) an analysis or calculation of the profits that would result from the liquidation of

the Partnership's assets on September 20, 2011, or (b) how such profits would be allocated to each of the partners in the Partnership." Another objection was that the buyout proposal did not "provide for the distribution to [appellants] of their respective portions of the profits of the Partnership to which [they] would be entitled under §§ 67-434 and 67-445." Appellants submitted an alternative buyout proposal which included the analysis and calculation they argued was missing from the partnership's proposal. The alternative proposal did not include mathematical calculations, but it generally calculated the buyout price based on the provision in paragraph 11 of the partnership agreement allocating profit percentages to the partners' income accounts. The alternative buyout proposal generally requested that each appellant receive 12.5 percent of the partnership's liquidation value.

In a January 4, 2012, journal entry, the district court found it would "not consider" the objections raised by appellants. The court granted appellants leave to submit written offers of proof in support of their objections, but ruled appellants could not present testimony on the objections. A formal hearing on the amount of the buyout was held on March 6.

At that hearing, appellants offered exhibit 118 as an offer of proof in support of their objections. The exhibit stated that if allowed to, Patricia would testify that she is a certified public accountant who is familiar with the meanings of the terms "net profits" and "net losses" as determined by generally accepted accounting principles. It further noted that Patricia had prepared a written statement of the book basis of the capital accounts of the partnership based upon a liquidation of assets on September 20, 2011, and attached her calculations. According to Patricia's calculations, the proper allocation of each partner's interest in the partnership was approximately 12.5 percent of the total value. This percentage was calculated after considering how profits from the hypothetical sale of the land required by §§ 67-434(2) and 67-445(2) would be allocated under the partnership agreement.

The partnership submitted a written objection to this offer of proof, but the district court did not rule on the objection on the record. In its final order, however, the court noted that

all "[o]bjections [had been either] taken under advisement or ruled upon on the record." It then expressly stated that "[o]bjections to all items of evidence taken under advisement are overruled."

The district court ultimately approved the partnership's proposed buyout, with minor alterations not related to appellants' stated objections. In computing the amount appellants were entitled to as a result of the required buyout, the district court arrived at a liquidation value for the partnership by subtracting the partnership's liabilities from its assets. The assets included the appreciated value of the partnership's land. The court then distributed the liquidation value to each partner based on his or her capital account, so appellants each received 5.33 percent of the total liquidation value. The court stated that if the sums were not paid by the 30th day, interest would accrue at the judgment interest rate of 2.056 percent.

## III. ASSIGNMENTS OF ERROR

Appellants assign, restated and summarized, that the district court erred in (1) failing to dissolve the partnership under § 67-439(5); (2) determining that James, Duane, and Carolyn failed to pay rent to the partnership and that all appellants engaged in wrongful conduct and should be dissociated from the partnership under § 67-431(5); (3) determining the amount of the buyouts of appellants and failing to include in the buyout amount of each appellant one-eighth of the net profits which would have resulted from capital gains arising from the liquidation of the partnership's assets; (4) failing to determine that interest on all buyouts payable to appellants commenced accruing on September 20, 2011; and (5) determining that the interest rate to be paid to appellants on their respective buyouts was the judgment rate rather than a market rate of interest.

On cross-appeal, appellees assign that the district court erred in (1) holding the date of dissociation was September 20, 2011, rather than May 2005, when appellants failed to pay their rents, and (2) determining the value of the partnership assets as of September 2011 instead of May 2005.

## IV. STANDARD OF REVIEW

[1,2] An action for a partnership dissolution and accounting between partners is one in equity and is reviewed de novo on the record.[2] On appeal from an equity action, we resolve questions of law and fact independently of the trial court's determinations.[3] But when credible evidence is in conflict on material issues of fact, we consider and may give weight to the fact the trial court observed the witnesses and accepted one version of the facts over another.[4]

[3-5] Statutory interpretation presents a question of law.[5] The interpretation of a partnership agreement presents a question of law.[6] An appellate court independently reviews a lower court's rulings on questions of law.[7]

## V. ANALYSIS

[6] The legal framework for our analysis is the 1998 UPA, which is Nebraska's counterpart to the model act known as the Revised Uniform Partnership Act (RUPA).[8] The 1998 UPA applies here even though the partnership was formed in 1997, because after January 1, 2001, the 1998 UPA became applicable to any Nebraska partnership, including those formed prior to January 1, 1998.[9]

The 1998 UPA replaced the original Uniform Partnership Act[10] and brought about significant changes in partnership law.

---

[2] *Shoemaker v. Shoemaker*, 275 Neb. 112, 745 N.W.2d 299 (2008).

[3] *Id*.

[4] *Id*.

[5] *Id*.

[6] *Id*.

[7] See *Blakely v. Lancaster County*, 284 Neb. 659, 825 N.W.2d 149 (2012).

[8] See *Shoemaker, supra* note 2 (citing Introducer's Statement of Intent, L.B. 523, Banking, Commerce, and Insurance Committee, 95th Leg., 1st Sess. (Feb. 18, 1997); Prefatory Note, Unif. Partnership Act (1997), 6 (part I) U.L.A. 5 (2001).

[9] §§ 67-464 and 67-467; *Shoemaker, supra* note 2.

[10] See Neb. Rev. Stat. §§ 67-301 to 67-346 (Reissue 2003). See *Shoemaker, supra* note 2.

Prior law required an at-will partnership to dissolve upon any partner's expressed will to dissolve the partnership.[11] RUPA, on which the 1998 UPA is based, sought to avoid mandatory dissolution of partnerships by making a partnership a distinct entity from its partners.[12] As we noted in *Shoemaker v. Shoemaker*,[13]

> "RUPA's underlying philosophy differs radically from [the original Uniform Partnership Act], thus laying the foundation for many of its innovative measures. RUPA adopts the 'entity' theory of partnership as opposed to the 'aggregate' theory that the [original Uniform Partnership Act] espouses. Under the aggregate theory, a partnership is characterized by the collection of its individual members, with the result being that if one of the partners dies or withdraws, the partnership ceases to exist. On the other hand, RUPA's entity theory allows for the partnership to continue even with the departure of a member because it views the partnership as 'an entity distinct from its partners.'"

RUPA, as embodied by our 1998 UPA, provides gap-filling rules that control only when a question is not resolved by the parties' express provisions in an agreement.[14] The parties agree that this case must be resolved by application of the statutory principles of the 1998 UPA.

### 1. DISSOCIATION OR DISSOLUTION?

The parties are in general agreement that they cannot continue in partnership with each other. They differ as to the appropriate remedy to be employed in ending their relationship. Appellants contend that the partnership should have been dissolved. Appellees argue that the district court correctly dissociated appellants from the partnership because this allows the partnership itself to continue with Ardith and Dennis as its remaining partners.

---

[11]  See, § 67-331; *Shoemaker, supra* note 2.

[12]  *Shoemaker, supra* note 2.

[13]  *Id*. at 125, 745 N.W.2d at 309-10 (citations omitted).

[14]  *Shoemaker, supra* note 2.

The statutory provisions governing dissociation and dis-solution are similar but not identical. Dissolution of a part-nership is governed by § 67-439, which provides that "[a] partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events," which include

> (5) On application by a partner, a judicial determina-tion that:
>
> (a) The economic purpose of the partnership is likely to be unreasonably frustrated;
>
> (b) Another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or
>
> (c) It is not otherwise reasonably practicable to carry on the partnership business in conformity with the part-nership agreement[.]

The district court concluded that none of these circumstances existed because (1) nothing had occurred which would frus-trate the partnership's ability to buy, sell, or own land, and (2) Ardith, as managing partner, had authority on behalf of the partnership to take the actions with which appel-lants disagreed.

Dissociation is a new concept introduced by RUPA "to denote the change in the relationship caused by a partner's ceasing to be associated in the carrying on of the business."[15] Under RUPA, "the dissociation of a partner does not necessar-ily cause a dissolution and winding up of the business of the partnership."[16] Section 67-431 lists events which may trigger a partner's dissociation, including

> (5) On application by the partnership or another part-ner, the partner's expulsion by judicial determination because:
>
> (a) The partner engaged in wrongful conduct that adversely and materially affected the partnership business;

---

[15] Unif. Partnership Act (1997), *supra* note 8, § 601, comment 1 at 164.

[16] *Id.*

(b) The partner willfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or the other partners under section 67-424; or

(c) The partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner.

In this case, the district court concluded that the grounds for dissociation stated in § 67-431(5)(a) and (c) were met by the failure of appellants to pay timely rent for the land leased from the partnership.

With these principles in mind, we first consider appellants' argument that the district court erred in determining that there were grounds to dissociate them from the partnership. Given that the sole business of the partnership was to own farmland which it leased to others, we have no difficulty concluding that the failure of appellants who executed leases to pay timely rents constituted wrongful conduct that adversely and materially affected the partnership business and made it not reasonably practical to carry on the partnership business with the existing partners. And we are not persuaded by the argument that James bore no responsibility for the nonpayment of rent because he had not signed a lease. Patricia initially testified that she and James had rented land from the partnership from 1997 through 2004. Later in her testimony, when shown a copy of the lease and asked if James had "ever been a tenant under a lease with Jacobs Cattle Company," she responded, "Not according to the lease agreements." But James testified that he owed money to the partnership prior to 2010. There is a reasonable inference that James knew that rent had not been paid to the partnership of which he and Patricia were both partners. Thus, regardless of whether he was legally obligated on the lease, James engaged in conduct which satisfied the grounds for dissociation stated in § 67-431(5)(a) and (c) to the same extent as the other appellants.

Next, we consider whether the district court erred in concluding that appellants failed to establish grounds for dissolution of the partnership. Appellees argue the district court

correctly decided this issue because no wrongdoing on the part of Ardith or Dennis has been proved. But even appellees acknowledge that "much acrimony exists between and among the parties."[17] At oral argument, appellees' counsel conceded that there were unspecified grounds for dissolution of the partnership, but argued that dissociation was nevertheless the appropriate remedy. We perceive this concession as agreement that the somewhat autocratic manner in which Ardith conducted the affairs of the partnership in recent years, even if not in violation of the partnership agreement, would constitute grounds for dissolution under § 67-439(5)(b), i.e., "conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner." We find no other possible grounds for dissolution. As we have noted, such conduct is also grounds for dissociation under § 67-431(5)(c), and the record supports the district court's determination that appellants engaged in such conduct. Thus, we conclude that there are grounds for dissolution of the partnership under § 67-439(5)(b) and dissociation of appellants under § 67-431(5)(a) and (c).

[7] Under the RUPA model upon which our statutes are based, the dissociation of a partner does not necessarily cause a dissolution and winding up of the partnership's business.[18] Generally, the partnership must be dissolved and its business wound up only upon the occurrence of one of the events listed in § 801 of RUPA, upon which Nebraska's § 67-439 is based.[19] The question we must resolve is whether dissolution is mandatory where the conduct of multiple partners constitutes grounds for dissolution under § 67-439(5)(b) and also constitutes grounds for dissociation pursuant to § 67-431(5)(c).

We have found no authority on this precise point. But the decision of the Supreme Court of Connecticut in *Brennan v.*

---

[17] Brief for appellees at 24.

[18] See, Unif. Partnership Act (1997), *supra* note 8, § 601, comment 1; *Warnick v. Warnick*, 76 P.3d 316 (Wyo. 2003).

[19] See Unif. Partnership Act (1997), *supra* note 8, § 601, comment 1, and § 801.

*Brennan Associates*[20] provides helpful guidance. In that case, the court concluded that a single partner's conduct fell within Connecticut's statutory equivalents of our §§ 67-431(5)(c) and 67-439(5)(b) such that it was not practicable for the remaining partners to carry on the business of the partnership with that partner. The court rejected an argument that the conduct would justify judicial dissolution of the partnership but not dissociation of the offending partner, concluding that "an irreparable deterioration of a relationship between partners is a valid basis to order dissolution, and, therefore, is a valid basis for the alternative remedy of dissociation."[21] A Kansas appellate court in *Giles v. Giles Land Co., L.P.*[22] followed the reasoning of *Brennan* in concluding that a court did not err in dissociating a partner where the evidence established that his conduct would justify either dissociation or dissolution under that state's counterparts to our §§ 67-431(5)(c) and 67-439(5)(b).

[8] We perceive no good reason to apply a different rule where the conduct of multiple partners makes it "not reasonably practicable to carry on the business in partnership" with each other.[23] Construing the dissolution remedy as mandatory in this circumstance would be contrary to the entity theory of partnership embodied in RUPA. As we noted in *Shoemaker*,[24] a main purpose of RUPA is "to prevent mandatory dissolution" of a partnership. Accordingly, we hold that where a court determines that the conduct of one or more partners constitutes grounds for dissociation by judicial expulsion under § 67-431(5)(c) and dissolution under § 67-439(5)(b), and there are no other grounds for dissolution, the court may in its discretion order either dissociation by expulsion of one or more partners or dissolution of the partnership.

We conclude that dissociation by judicial expulsion of appellants is an appropriate remedy under the facts of this

---

[20] *Brennan v. Brennan Associates*, 293 Conn. 60, 977 A.2d 107 (2009).

[21] *Id.* at 81, 977 A.2d at 120.

[22] *Giles v. Giles Land Co., L.P.*, 47 Kan. App. 2d 744, 279 P.3d 139 (2012).

[23] § 67-431(5)(c).

[24] *Shoemaker, supra* note 2, 275 Neb. at 130, 745 N.W.2d at 312.

case. Individually and in trust, Ardith and Dennis have a capital interest in the partnership of approximately 78 percent. Pursuant to the partnership agreement, Ardith has general management authority to conduct the day-to-day business on behalf of the partnership. We agree with the finding of the district court that there is no apparent reason why the partnership cannot continue to exist and function in accordance with the partnership agreement with Ardith and Dennis as its sole partners. Accordingly, we conclude that the first and second assignments of error as restated above are without merit.

## 2. Issues Pertaining to Buyout Price

The remaining issues pertain to the district court's calculation of the buyout price which the dissociated partners are to receive for their interests in the partnership. This price is governed by § 67-434(2), which provides:

The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under subsection (2) of section 67-445 if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment.

Section 67-445(2) provides in pertinent part:

Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, profits and losses that result from the liquidation of the partnership assets must be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. A partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account but excluding from the calculation charges attributable to an

obligation for which the partner is not personally liable under section 67-418.

### (a) Date of Dissociation

The district court determined the date of dissociation was September 20, 2011, the date it entered its order that appellants were dissociated by judicial expulsion pursuant to § 67-431(5). In their cross-appeal, appellees contend that the court should have found the date of dissociation to be in May 2005, when the nonpayment of rent which the district court determined to be grounds for dissociation occurred. Due to the appreciation of the land owned by the partnership, using the earlier date to calculate the partnership's assets would result in a substantially lower buyout price.

Appellees urge us to adopt the reasoning of two pre-RUPA partnership dissolution cases from other jurisdictions, *King v. Evans*[25] and *Oliker v. Gershunoff*.[26] *King* involved a dissolution caused by the nonjudicial expulsion of a partner, while *Oliker* involved a dissolution resulting from a partner's withdrawal from the partnership. In each case, partnership assets were valued as of the date of dissolution, i.e., the partner's nonjudicial expulsion in *King* and the partner's withdrawal in *Oliker.* But we find both cases distinguishable because neither involves a dissociation of a partner by judicial expulsion under a statute based on the RUPA model.

[9,10] The language of a statute is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[27] Clearly, the phrase "date of dissociation" as used in § 67-434(2) refers to the date of the event which resulted in the dissociation. The events which may result in dissociation are listed in § 67-431. Some of these, such as a partner's withdrawal[28] or expulsion pursuant

---

[25] *King v. Evans*, 791 S.W.2d 531 (Tex. App. 1990).

[26] *Oliker v. Gershunoff*, 195 Cal. App. 3d 1288, 241 Cal. Rptr. 415 (1987).

[27] See *Pittman v. Western Engineering Co.*, 283 Neb. 913, 813 N.W.2d 487 (2012).

[28] § 67-431(1).

to the partnership agreement,[29] occur without any judicial intervention. But in this case, the dissociation occurred as a result of expulsion by judicial determination pursuant to § 67-431(5). Appellants were not dissociated from the partnership until the district court determined that they had engaged in conduct described in § 67-431(5)(a) and (c). We find nothing in § 67-431 or § 67-434 which would make the dissociation retroactive to the date of the conduct which was judicially determined to be grounds for expulsion, and we will not read into a statute a meaning that is not there.[30] Accordingly, we conclude that the district court did not err in calculating the buyout price as of September 20, 2011, the date of dissociation by judicial expulsion.

### (b) Appellants' Share of Appreciated Value of Land

The land owned by the partnership is a capital asset. Under the operative partnership agreement, the partners each had a capital account. The value of the capital account was "directly proportionate to [each partner's] original Capital contributions as later adjusted for draws taken from the Partnership." At the time of dissociation, the capital account of each appellant was approximately 5.33 percent of the total capital in the partnership.

Each partner also had an income account under the partnership agreement. Net profits and net losses of the partnership were to be "credited or debited to the individual income accounts [of each partner] as soon as practicable after the close of each fiscal year." The agreement provided that the "term[s] 'net profits' and 'net losses' shall mean the net profits and net losses of the Partnership as determined by generally accepted accounting principles." It further noted that "[t]he net profits and net losses of the Partnership" were distributable or chargeable "to each of the Partners in proportion to the votes they have." Under the agreement, Ardith had two votes (one as

[29] § 67-431(3).

[30] *Blakely v. Lancaster County, supra* note 7; *Butler Cty. Sch. Dist. v. Freeholder Petitioners*, 283 Neb. 903, 814 N.W.2d 724 (2012).

trustee for each trust), Dennis had two votes, and appellants each had one vote, for a total of eight votes. Thus, appellants each had a 12.5 percent share of net profits and losses in their income account.

The district court expressly found that appellants' "interests in the partnership shall be purchased by the partnership as required by Neb.Rev.Stat.Sec. 67-434." In its ruling, the district court considered the value of the partnership's assets, including the appreciated value of the land, less the partnership's liabilities, and arrived at a liquidation value for the partnership. It then accepted appellees' argument that the proper buyout price was calculated by applying each partner's capital account percentage to the partnership's total liquidation value.

On appeal, appellants agree the buyout was to be calculated pursuant to § 67-434 and agree with the district court's liquidation value of the partnership. But they argue the district court erred in calculating the buyout price because it did not consider how the hypothetical capital gain realized from treating the land as though it had been sold on the date of dissociation would flow to each partner based on the partnership agreement's allocation of net profits and losses. Appellants contend the proper calculation results in each of them receiving a buyout equal to 12.5 percent of the liquidation value of the partnership.

Appellants' argument rests on two premises: (1) that a capital gain would be realized upon a hypothetical selling of the partnership land pursuant to § 67-434(2), which would constitute "profits" within the meaning of § 67-445(2), and (2) that the hypothetical profit would constitute "net profits" within the meaning of paragraph 11 of the partnership agreement. Section 67-434(2) provides that the buyout price of a dissociated partner's interest is to be based on the amount that "would have been distributable to the dissociating partner" under § 67-445(2) "if, on the date of dissociation, the assets of the partnership were sold at . . . liquidation value . . . and the partnership were wound up as of that date." Section 67-445(2) then provides that "profits and losses that result from [such]

liquidation of the partnership assets must be credited and charged to the partners' accounts."

It is clear from the plain language of § 67-434(2) that the proper calculation must be based upon the assumption that the partnership assets, here the land, were sold on the date of dissociation, even though no actual sale occurs. Here, the initial question is whether selling the partnership land on the date of dissociation would result in a capital gain and "profits" in the context of § 67-445(2). We consider this to be a question of statutory interpretation.

The term "capital gain" means "profit realized when a capital asset is sold or exchanged."[31] The term "profit" is generally defined as the "excess of revenues over expenditures in a business transaction."[32] We are required to give the language of a statute its plain and ordinary meaning.[33] Accordingly, we conclude that the capital gain which would be realized upon a hypothetical liquidation of the partnership's land on the date of dissociation (as required by § 67-434(2)) would constitute "profits" within the meaning of the phrase in § 67-445(2).

The remaining question is how those "profits" should be "credited and charged to the partners' accounts"[34] in this particular situation. Appellants contend that it must be done pursuant to paragraph 11 of the partnership agreement, which specifically states how "net profits" and "net losses" "as determined by generally accepted accounting principles" are to be distributed to the partners. But there is no expert testimony equating this type of capital gain to "net profits" under "generally accepted accounting principles." Appellants attempted to introduce Patricia's testimony on this issue to explain how such a characterization would affect the ultimate distribution of the partnership assets, but the district court refused the evidence and instead allowed only an unsworn offer of proof. We

---

[31] Black's Law Dictionary 237 (9th ed. 2009).

[32] *Id.* at 1329.

[33] See *Pittman v. Western Engineering Co., supra* note 27.

[34] See § 67-445(2).

conclude that the district court erred in refusing to consider evidence on this issue, and we reverse that portion of its order calculating the amount of the buyouts and remand the cause with directions for the court to reconsider the buyout calculations after receiving appellants' evidence on this issue. In this respect, we note that RUPA

> eliminates the distinction in [the original Uniform Partnership Act] between the liability owing to a partner in respect of capital and the liability owing in respect of profits. Section 807(b) [of RUPA] speaks simply of the right of a partner to a liquidating distribution. That implements the logic of RUPA Sections 401(a) and 502 under which *contributions to capital and shares in profits and losses combine to determine the right to distributions*.[35]

### (c) Interest

The district court determined that the amounts due appellants for their partnership interests should be paid within 30 days of the final order entered April 18, 2012, and that if not paid within that period, interest would accrue at the judgment rate. Appellants argue that the interest actually began to accrue on September 20, 2011, the date the court determined that appellants were dissociated from the partnership. We agree. Section 67-434(2) specifically provides that interest on the buyout price of a dissociated partner's interest "must be paid from the date of dissociation to the date of payment." As we have noted, the "date of dissociation" was September 20, 2011. Appellants are entitled to interest on the buyout price from that date until the date of payment.

Appellants also contend that the district court erred in ordering that interest should be computed at the "judgment interest rate." They contend that they are instead entitled to interest at the higher "market rate."[36] We agree in part with this argument.

---

[35] Unif. Partnership Act (1997), *supra* note 8, § 807, comment 3 at 207 (emphasis supplied).

[36] Brief for appellants at 15.

Neb. Rev. Stat. § 45-103 (Reissue 2010) is the source of the district court's "judgment interest rate." It specifies the interest rate to be paid on judgments for the payment of money. However, § 45-103 provides that its rate shall not apply to "(1) [a]n action in which the interest rate is specifically provided by law." Here, § 67-434 specifically provides that interest is to be paid from the date of dissociation until the date the buyout payment is made. And § 67-405 provides that "[i]f an obligation to pay interest arises under [the 1998 UPA] and the rate is not specified, the rate is that specified in section 45-104.01 . . . ." And Neb. Rev. Stat. § 45-104.01 (Reissue 2010) provides that interest be assessed at a rate of 14 percent per annum. We conclude that it is this rate, and not the judgment rate, that applies in this case.

## VI. CONCLUSION

Based upon our de novo review and for the reasons discussed, we conclude that the district court did not err in dissociating appellants from the partnership by judicial expulsion as of September 20, 2011. We also conclude that the district court did not err in declining to dissolve the partnership. However, we conclude the district court erred in failing to allow appellants to introduce evidence on the proper calculation of the buyout price and further erred in its determination with respect to interest. We modify the judgment to provide that interest on the amounts due appellants should accrue at 14 percent per annum from September 20, 2011, until paid, and we reverse the judgment and remand the cause for further proceedings on the proper calculation of the buyout price.

AFFIRMED IN PART AS MODIFIED, AND IN PART REVERSED
AND REMANDED FOR FURTHER PROCEEDINGS.

HEAVICAN, C.J., and MILLER-LERMAN, J., participating on briefs.

WRIGHT, J., not participating.