the first workday after the 30-day appeal time ended on Saturday, April 5. The petition was filed within the statutory 30-day time period of both issuance and delivery of the Commission's order. Thus, the petition in error was timely filed, and the district court erred when it dismissed the case for lack of jurisdiction.

## CONCLUSION

Although, typically, decisions rendered by an inferior tribunal, board, or commission are final when they are announced on the record, the specificity in § 23-1734 overrides that general rule. An order is not final until it meets the requirements in § 23-1734. Those requirements state that the order must be in writing, "certified" to the sheriff, and delivered. This order was not in writing until it was issued on March 6, 2014, and not delivered until March 21. March 21 is the earliest date from which the order can be considered final under § 23-1734(2), because the order was not delivered to the parties until that date. The appeal was taken well within 30 days of this date. We reverse the district court's judgment and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

---

BAUERMEISTER DEAVER ECOLOGY LAND USE DEVELOPMENT,
LLC, AS SUCCESSOR IN INTEREST TO DOROTHY L.
BAUERMEISTER, INDIVIDUALLY, ET AL., APPELLANT,
V. WASTE MANAGEMENT CO. OF
NEBRASKA, INC., APPELLEE.
___ N.W.2d ___

Filed May 15, 2015.    No. S-14-553.

1. **Equity: Quiet Title: Accounting.** An action to quiet title and for an accounting sound in equity.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations.
3. **Waiver: Words and Phrases.** Waiver is a voluntary relinquishment of a known right.

4. **Equity: Estoppel.** The doctrine of equitable estoppel applies where, as a result of conduct of a party upon which another person has in good faith relied to his detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed.

5. ____: ____. Six elements must be satisfied for the doctrine of equitable estoppel to apply: (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or influence, the other party or other persons; (3) knowledge, actual or constructive, of the real facts; (4) lack of knowledge and the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed.

David A. Domina and Christopher A. Mihalo, of Domina Law Group, P.C., L.L.O., for appellant.

Thomas A. Grennan, Adam J. Wachal, and Abbie M. Schurman, of Gross & Welch, P.C., L.L.O., for appellee.

Heavican, C.J., Connolly, McCormack, and Miller-Lerman, JJ., and Irwin, Judge.

Heavican, C.J.

## INTRODUCTION

This case was originally docketed as an action for specific performance and an accounting. The two actions were severed, with this court and the Nebraska Court of Appeals finding for Dorothy Bauermeister and the other plaintiffs[1] with respect to the specific performance action. On remand, Waste Management Co. of Nebraska, Inc. (WMN), was ordered to, and did, convey title of the disputed property to the plaintiffs, subject to specified exceptions.

---

[1] See, *Bauermeister v. Waste Mgmt. Co.*, 280 Neb. 1, 783 N.W.2d 594 (2010); *Bauermeister v. Waste Mgmt. Co.*, A-09-019, 2010 WL 4009059 (Neb. App. Oct. 12, 2010) (selected for posting to court Web site).

The accounting action then proceeded. The district court found primarily for WMN. Bauermeister Deaver Ecology Land Use Development, LLC (BDELUD), successor in interest to the plaintiffs, appeals. We affirm.

FACTUAL BACKGROUND

Fred and Dorothy Bauermeister and Richard and Clara Deaver entered into an agreement with WMN on March 22, 1989, for the sale of 280 acres of farmland. WMN intended to build a landfill on this property. This agreement provided that WMN, as the purchaser, pay on a monthly basis to the Bauermeisters and the Deavers, as sellers, $3,000 in base rent and another $1, later adjusted to $1.15, per ton of refuse added to the landfill (referred to as the "royalty fee" or "royalty payment").

As relevant to this appeal, paragraph 6 of the agreement, dealing with the construction of improvements, provided:

> Purchaser, at its cost, shall have the right to make any alternations, modifications or improvements to the Premises including, without limitation: (a) the demolition of existing facilities without replacement thereof and renovation of existing facilities; (b) the right to construct roads, berms, ditches, stream diversions, embankments, temporary waste holding and storage facilities, office and garage facilities[,] laboratories, equipment shelters and any and all other facilities or land improvements necessary or required for Purchaser's operations (including storage and maintenance of Purchaser's waste collection vehicles); (c) the right to excavate, extract and, except as otherwise provided herein, relocate on the Premises for any purpose, gravel, soil, clay and all other minerals, materials and substances of any nature whatsoever (whether solid, liquid or gaseous) produced at or under the Premises or emanating therefrom or incident to the utilization of the Premises as a Landfill (title to all of such substances being, upon extraction thereof from the Premises, the sole and exclusive property of Seller[s], except that the title to any gas generated by the Refuse shall remain the sole and exclusive property of

Purchaser); (d) the right to drill and establish water wells, install utilities, such as, but not limited to, electric lines, sewer lines, gas lines, underground storage tanks and telephone lines; (e) the right to carry out all gasification, waste handling, storage, treatment, disposal and similar operations, including, but not limited to, ponding, cover stock piling, fill and cover placement and compaction, drainage, pollution and nuisance prevention; and (f) the right to deposit subject to applicable permit within the Premises, all manner and form of solid and liquid waste materials. Seller[s] reserve[] for themselves, their successors, heirs and assigns, all insitu oil, gas and mineral deposits located on the Premises, and the right to extract from the Premises such deposits so long as such extraction in no way interferes with the conduct of Purchaser's Landfill operations.

Paragraph 10 of the agreement, entitled "Taxes," stated:

Purchaser covenants that it will promptly pay, as and when they become due, all real estate taxes and assessments against the Premises, and all levies and impositions of any nature relating to or imposed upon the Premises. Purchaser's obligations to pay real estate taxes shall continue beyond closure of the Landfill site and remain until such time as the Premises no longer require post-closure monitoring as provided in Paragraph 17 hereof.

Paragraph 14, regarding the removal of improvements, provided:

The parties hereto understand and agree that title to all buildings, equipment and other improvements (collectively, "Improvements") installed, constructed or located by Purchaser upon the Premises shall remain in Purchaser and the same shall at all times remain Purchaser's personal property regardless of the nature of fixation to the Premises. Should Seller[s] exercise their option to purchase contained in Paragraph 30 hereof, Purchaser shall remove, unless otherwise agreed to in writing by Purchaser and Seller[s], all such Improvements that Purchaser has installed, constructed or located upon the

Premises, except those Improvements required or neces-
sary to protect the environment, provided the same shall
be removed within sixty (60) days after the termination or
cancellation of this Agreement, or any extension thereof,
for any reason. Title to any Improvements not so removed
by Purchaser shall vest in Seller[s].

Paragraph 16 provided for closure and postclosure monitor-
ing of the landfill:

After termination of this Agreement and the exercise of
Seller[s] of their option contained in Paragraph 30 hereof,
for any reason, Seller[s] shall not disturb the integrity
of the cover materials placed over the Premises in any
manner, whether through excavation, cultivation, boring,
regrading or otherwise, nor construct any structures on
the Premises (except that paving shall be permitted), nor
alter any venting wells, vegetation or drainage then exist-
ing at the Premises unless Purchaser expressly consents
to such activity until such time as the Premises no longer
require post-closure monitoring. . . .

After the termination of this Agreement and the exer-
cise of Seller[s] of their option contained in Paragraph 30
hereof, for any reason, Purchaser shall be granted access
to the Premises to conduct such post-operation care,
maintenance and monitoring of the Premises as it deems
advisable, and/or shall be required by the then regulating
government agency responsible for the oversight of the
operation of sanitary landfills, and Purchaser shall con-
tinue to care for, maintain and monitor the Landfill site
for the greater of a period of ten (10) years or until such
regulating government agency determines that such post-
closure care is no longer required.

Finally, paragraph 30 provided for the sellers' option
to buy:

If Seller(s), their successors or heirs so choose, Seller(s)
shall have the option to repurchase all or any portion of
the Premises from Purchaser in consideration for the sum
of One Dollar ($1.00), at the termination, for any reason,
of this Agreement, and Purchaser shall be obligated to

sell the Premises to Seller(s), their successors or heirs, if they so choose. Seller[s'] option may be exercised from the date of termination of the Landfill until two years after the date of termination of the required monitoring of the Landfill pursuant to Paragraph 16.

. . . .

The parties shall execute a short form memorandum of this option pertaining to each parcel, *as deeded*, in recordable form which shall be recorded in the official records (Register of Deeds) in Douglas County, Nebraska.

(Emphasis supplied.)

WMN began receiving municipal solid waste at the site on September 1, 1989. Municipal solid waste generates methane gas. In the early years, this gas was collected and "flared" off, as otherwise the gas was a nuisance, possible contaminant, and fire hazard. But beginning in spring 2001, WMN and the Omaha Public Power District entered into a series of agreements whereby the district agreed to purchase the landfill gases generated at the site. According to the record, WMN had total gross revenues of $1,224,231.91 in landfill gas sales, as well as $369,594.19 in tax credits under the federal tax code.

Meanwhile, on June 24, 2002, WMN and another company entered into an agreement for a monofill to be located on the site. A monofill is a type of landfill that accepts only one type of waste—in this case, gypsum—from the company's nearby plant. WMN began accepting gypsum in January 2003. During this time, it is undisputed that WMN made all base rent and royalty payments.

On November 19, 2003, WMN stopped accepting municipal solid waste at the site, but continued to accept gypsum at the monofill. WMN continued to make base rent and royalty payments as a result of the operation of the monofill.

On August 31, 2006, the Bauermeisters and the Deavers attempted to exercise their option to purchase under paragraph 30 of the agreement. On October 17, they filed suit against WMN for specific performance and an accounting. On October 18, 2007, they made a second attempt to exercise

their option. As explained in more detail below, a trial, appeal, remand, and eventually judgment for the Bauermeisters and the Deavers followed. On March 17, 2011, WMN executed deeds for the property in favor of the Bauermeisters and the Deavers.

In December 2009, WMN made a final base rental payment to the Bauermeisters and the Deavers. In October 2010, WMN made a final royalty payment to the Bauermeisters. A month later, in November, WMN stopped accepting gypsum at the monofill. According to the record, WMN's net revenue for the monofill was $4,653,313.93.

At this point, neither the landfill nor the monofill are accepting further waste. Both are now in their respective monitoring periods as required by state law.

## PROCEDURAL BACKGROUND

In the action filed on October 17, 2006, the Bauermeisters and the Deavers sought specific performance, accounting, quiet title, and declaratory judgment. WMN asserted several affirmative defenses, including that Dorothy Bauermeister and Clara Deaver lacked standing and were not the real parties in interest, and that the option to repurchase violated the common-law rule against perpetuities.

The district court severed the specific performance and quiet title actions from the accounting and declaratory judgment actions and concluded that Dorothy Bauermeister and Clara Deaver had standing and were the real parties in interest. The district court then concluded that they clearly intended to exercise the option to repurchase and had validly done so. WMN was ordered to convey title of the property to the Bauermeisters and the Deavers as follows: "Defendant, [WMN], shall convey, by warranty deed, with a covenant against liens, mortgages, or encumbrances, *except encumbrances of record as of March 22, 1989*, all the following described real estate . . . ." (Emphasis supplied.) As noted, the parties signed the purchase agreement on March 22, 1989.

In lieu of a supersedeas bond for an appeal, WMN sought the court's approval of its deposit of two warranty deeds with

the court[2] and served notice of its request on BDELUD. The court approved the deposit of the warranty deeds in lieu of a bond on January 2, 2009, and WMN filed its appeal on the same day. Only a portion of the deeds were included in the record of the 2009 appeal. But copies of the warranty deeds in the 2014 transcript show that they were signed on February 4, 2009, shortly after the first appeal was docketed. The exceptions in the warranty deeds that the court approved were consistent with its judgments against WMN:

GRANTOR covenants with GRANTEES that GRANTOR:

(1) is lawfully seized of such real estate and that it is free from encumbrances, except:

a) encumbrances of record as of March 22, 1989;

b) applicable local, state and federal ordinances, rules, regulations, statutes, permits and licenses;

c) encumbrances arising by law from the use of the real property as a landfill and/or monofill;

d) the Purchase Agreement executed March 22, 1989 . . . .

In the first appeal, the Court of Appeals reversed, concluding that the option was barred by the common-law rule against perpetuities.[3] But we reversed, concluding that the common-law rule against perpetuities did not apply to the option from the agreement.[4] We ordered the cause remanded to the Court of Appeals for further consideration of WMN's appeal. Finding no other error, the Court of Appeals affirmed the

_____

[2] See Neb. Rev. Stat. § 25-1917 (Reissue 2008) ("[i]nstead of the undertaking prescribed in subdivision (2) of section 25-1916, the conveyance or other instrument may be executed and deposited with the clerk of the court in which the judgment was rendered or order made, to abide the judgment of the appellate court").

[3] *Bauermeister v. Waste Mgmt. Co.*, No. A-09-019, 2009 WL 6473172 (Neb. App. Dec. 8, 2009) (selected for posting to court Web site), *reversed, supra* note 1, 280 Neb. 1, 783 N.W.2d 594 (2010).

[4] *Bauermeister v. Waste Mgmt. Co., supra* note 1, 280 Neb. 1, 783 N.W.2d 594 (2010).

district court's judgment.[5] Following this affirmance, WMN conveyed the warranty deeds to the the Bauermeisters and the Deavers.

The accounting portion of the underlying action was then heard by the district court. On March 31, 2014, the district court entered an order largely finding for WMN. First, the district court found that the 1989 agreement had continuing viability, because the parties both had continuing obligations under that agreement. Second, the district court concluded that WMN must continue to monitor the landfill for a period of time and pay taxes on the property, per the agreement. Third, the district court found that WMN was entitled to the profits earned from the landfill gases and owned the pipes and underground equipment used in the gasification process. Fourth, the district court found that the Bauermeisters and the Deavers, now BDELUD, were entitled to payment from WMN for its failure to remove structures from the property which were unrelated to the ongoing environmental monitoring process. Fifth, because the Bauermeisters and the Deavers waived any objection to the monofill, the district court concluded that BDELUD was not entitled to any profit received by WMN in connection with its operation of the monofill. And because the district court concluded that the gas refuse and monofill profits were owned by WMN, BDELUD was not entitled to an accounting or a declaratory judgment or recovery for conversion. The district court further declined to address any of WMN's affirmative defenses and declined to award prejudgment interest.

On April 16, 2014, WMN paid $88,499.80 to satisfy the judgment against it. Meanwhile, BDELUD filed a motion for new trial, which was denied on June 6. BDELUD appeals.

## ASSIGNMENTS OF ERROR

On appeal, BDELUD's assignments of error can be restated and consolidated into two general assignments: The district

---

[5] *Bauermeister v. Waste Mgmt. Co., supra* note 1, No. A-09-019, 2010 WL 4009059 (Neb. App. Oct. 12, 2010) (selected for posting to court Web site).

court erred in (1) finding that WMN owned the landfill gases and equipment associated with collecting and transporting the landfill gases and that WMN was entitled to all landfill gas revenue and (2) finding that BDELUD was not entitled to past or future revenues from the monofill.

## STANDARD OF REVIEW

[1,2] An action to quiet title and for an accounting sound in equity.[6] On appeal from an equity action, an appellate court resolves questions of law and fact independently of the trial court's determinations.[7]

## ANALYSIS

*Landfill Gases.*

BDELUD makes several assignments of error regarding the ownership of the landfill gases, which can be restated as one: that as of September 1, 2006, the day after the Bauermeisters and the Deavers notified WMN of their intent to exercise their option to purchase under the agreement, they were the owners of record of the landfill gases. BDELUD argues that WMN did not raise the issue of the landfill gases in the specific performance action and that the ownership of those gases was finally decided in BDELUD's favor when the Court of Appeals found that the Bauermeisters and the Deavers were the owners of the real estate. In other words, BDELUD argues that the district court's decision was barred by res judicata or the law-of-the-case doctrine. We disagree.

*Law-of-the-Case Doctrine.*

To determine the application of the law-of-the-case doctrine, we must necessarily review our record of the 2009 appeal. A court may judicially notice adjudicative facts, which are not subject to reasonable dispute, at any stage of the proceeding.[8] In interwoven and interdependent cases, we can examine our own records and take judicial notice of the proceedings and

---

[6] See, *Schellhorn v. Schmieding*, 288 Neb. 647, 851 N.W.2d 67 (2014); *Robertson v. Jacobs Cattle Co.*, 285 Neb. 859, 830 N.W.2d 191 (2013).

[7] *Id.*

[8] *Pennfield Oil Co. v. Winstrom*, 276 Neb. 123, 752 N.W.2d 588 (2008).

judgment in a former action involving one of the parties.[9] We can also take judicial notice of a document, including briefs filed in an appeal, in a separate but related action concerning the same subject matter in the same court.[10] We turn to the guiding principles under the law-of-the-case doctrine.

The law-of-the-case doctrine reflects the principle that an issue litigated and decided in one stage of a case should not be relitigated at a later stage.[11] Under this doctrine, an appellate court's holdings on issues presented to it conclusively settle all matters ruled upon, either expressly or by necessary implication.[12] The doctrine applies with greatest force when an appellate court remands a case to an inferior tribunal.[13] Upon remand, a district court may not render a judgment or take action apart from that which the appellate court's mandate directs or permits.[14]

Additionally, under the mandate branch of the law-of-the-case doctrine, a decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are deemed to have waived the right to challenge that decision.[15] But an issue is not considered waived if a party did not have both an opportunity and an incentive to raise it in a previous appeal.[16]

Here, the court's final order in the 2009 appeal shows that WMN's reservations of rights in the purchase agreement were encumbrances on the warranty deed, and we agree. As stated, the last sentence of paragraph 30 required the parties to record the sellers' purchase option "as deeded." That term must be

---

[9] *Id.*

[10] *Id.*

[11] *In re 2007 Appropriations of Niobrara River Waters*, 283 Neb. 629, 820 N.W.2d 44 (2012).

[12] *Id.*

[13] *County of Sarpy v. City of Gretna*, 276 Neb. 520, 755 N.W.2d 376 (2008).

[14] *Id.*

[15] *Id.*

[16] *Id.*

understood in the context of the entire agreement, and the court's judgment excluded encumbrances of record as of March 22, 1989, from its order to convey the property. This exclusion implicitly referred to the parties' purchase agreement.

We conclude that the records in the 2009 appeal show that WMN had no incentive to raise its rights under the 1989 purchase agreement, because the court had permitted it to exclude its rights under the purchase agreement from the warranty deeds that the court ordered and approved. Additionally, we note that BDELUD has repeatedly claimed that under the agreement, WMN has continuing obligations to pay property taxes and to engage in environmental monitoring. These claims illustrate that the parties understood the purchase agreement as imposing continuing obligations and rights. It is untenable for BDELUD to claim that it is entitled to ongoing benefits under the agreement, but with no obligations.

In sum, because WMN had no incentive to raise its rights under the purchase agreement in the first appeal, and because those issues were not presented to us on appeal and are not required to be presented to us, neither our mandate nor the Court of Appeals' mandate precluded WMN from relying on those rights in the proceedings on remand.

Relatedly, res judicata did not preclude WMN from asserting its property interests on remand, because the court specifically allowed WMN to include exceptions in the warranty deeds for its rights under the purchase agreement.[17] We reject BDELUD's argument that our decision in the 2009 appeal precluded the court from considering the parties' rights under the 1998 purchase agreement.

*Purchase Agreement Controls*
*Right to Landfill Gases*.

BDELUD concedes the purchase agreement expressly gives WMN title to the landfill gases and to the proceeds from

---

[17] See *State v. York*, 273 Neb. 660, 665-66, 731 N.W.2d 597, 603 (2007) (stating that "[d]octrine of res judicata, or claim preclusion, only bars the relitigation of a matter that has been directly addressed or necessarily included in a former adjudication if the former judgment was on the merits").

landfill gasification. As set out above, paragraph 6 explicitly reserves to the seller "all insitu oil, gas and mineral deposits located on the Premises." BDELUD directs us to no case law, and we find none, that definitively holds methane gas produced by the refuse is a mineral. And we need not decide that issue here, because paragraph 6 explicitly gave WMN title to gas generated by refuse in the landfill:

> [WMN shall have] the right to excavate, extract and . . . relocate . . . all other minerals, materials and substances of any nature whatsoever (whether solid, liquid or gaseous) produced at or under the Premises or emanating therefrom or incident to the utilization of the Premises as a Landfill (title to all of such substances being, upon extraction thereof from the Premises, the sole and exclusive property of Seller[s], *except that the title to any gas generated by the Refuse shall remain the sole and exclusive property of* [*WMN*].

(Emphasis supplied.)

BDELUD's only argument against applying these provisions is that upon reconveyance, all aspects of the real estate belong to it. We have rejected its argument that the court could not consider restrictions in the conveyance under the 1989 purchase agreement. We conclude there is no merit to BDELUD's assignments of error regarding the landfill gases.

*Landfill Gas Fixtures.*

The same reasoning applies to BDELUD's argument that the district court erred in concluding that the structures on the property used to collect the landfill gases were the property of WMN. BDELUD contends that these structures are fixtures and, further, that these issues were decided when this court and the Court of Appeals adjudicated the real estate ownership issues, as is discussed in further detail above. Because we have rejected that argument, paragraph 14 of the purchase agreement controls. Under that provision, whether WMN's gas collection system could be considered a fixture is irrelevant:

> [T]itle to all buildings, equipment and other improvements (collectively, "Improvements") installed, constructed or located by Purchaser upon the Premises shall

remain in Purchaser and the same shall at all times remain
Purchaser's personal property *regardless of the nature of
fixation to the Premises*. Should Seller[s] exercise their
option to purchase contained in Paragraph 30 hereof,
Purchaser shall remove, unless otherwise agreed to in
writing by Purchaser and Seller[s], all such Improvements
that Purchaser has installed, constructed or located upon
the Premises, *except those Improvements required or nec-
essary to protect the environment* . . . .

(Emphasis supplied.) Additionally, paragraph 6(e) gave WMN
"the right to carry out all gasification, waste handling, storage,
treatment, disposal and similar operations."

Thus, prior to the exercise of the option by BDELUD's
predecessors, the gas collection system was WMN's personal
property, regardless of its fixation to the site. The record shows
that the collection and removal of the landfill gases is neces-
sary to protect the environment. And BDELUD has consist-
ently noted that WMN has ongoing environmental monitoring
responsibilities. We conclude that the parties did not intend for
the collection system to become a fixture of the property after
BDELUD exercised its purchase option as long as WMN was
exercising its rights under paragraph 6.

*Monofill.*

In its last set of assignments of error, BDELUD assigns
that the district court erred in finding that it was not entitled
to past or future monofill revenues. The district court con-
cluded that the predecessors of BDELUD had not objected
to the construction of the monofill, had accepted royalty
payments in connection with the gypsum deposits made on
the land, and had accordingly waived and were equitably
estopped from arguing that it had any entitlement to mono-
fill revenues.

[3-5] Waiver is a voluntary relinquishment of a known
right.[18] The doctrine of equitable estoppel applies where, as

---

[18] See *State ex rel. Wagner v. Amwest Surety Ins. Co.*, 280 Neb. 729, 790
N.W.2d 866 (2010).

a result of conduct of a party upon which another person has in good faith relied to his detriment, the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed.[19] Six elements must be satisfied for the doctrine of equitable estoppel to apply: (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or influence, the other party or other persons; (3) knowledge, actual or constructive, of the real facts; (4) lack of knowledge and the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel.[20]

In finding waiver and estoppel, the district court noted that "[BDELUD's] predecessors' communications and conduct, and [BDELUD's] ongoing receipt of benefits under the 1989 Agreement illustrate [BDELUD] consented to the Monofill and considered the Monofill to be part of the 1989 Agreement. [BDELUD] cannot now ask for money [WMN] has made in relation to the Monofill."

We agree. Waiver and estoppel are both evident from the actions of BDELUD's predecessors, the Bauermeisters and the Deavers. At trial, BDELUD argued that the agreement did not envision using the land as an industrial landfill and that after it was built in 2001, it was not anticipated that the municipal landfill would close in 2003. And indeed, there is no mention of a monofill or industrial landfill in the agreement.

But there is a course of action by BDELUD's predecessors that suggests acquiescence in the chain of events as they

---

[19] *Christiansen v. County of Douglas*, 288 Neb. 564, 849 N.W.2d 493 (2014).

[20] *American Family Mut. Ins. Co. v. Regent Ins. Co.*, 288 Neb. 25, 846 N.W.2d 170 (2014).

occurred. When the monofill was anticipated in and around 2001, notice was sent to neighboring landowners, including to BDELUD's predecessors. Those predecessors were represented by counsel at meetings on the construction of the monofill. They did not object and in fact indicated that they had no objection so long as they continued to receive royalty payments. In fact, in a letter to WMN regarding the monofill, counsel acting on behalf of the Bauermeisters suggested that the monofill was "clearly within the Purchase Agreement and related documents" and that the Bauermeisters, among others, were "clearly entitled to the existing royalty on waste of any kind deposited in the [monofill] under the terms of the Purchase Agreement." Those royalty payments were paid by WMN right up until the closure of the monofill and past the August 31, 2006, date of the exercise of the option to purchase.

This course of action is contrary to the BDELUD's now-stated contention that its predecessors never intended to get their land back with gypsum reserves on it, or that they never intended that the monofill would operate past the operation of the landfill. This course of action suggests waiver, and further suggests that BDELUD should be estopped from asserting any position contrary to this course of action.

BDELUD's assignments of error regarding the monofill are also without merit.

## CONCLUSION

The decision of the district court is affirmed.

AFFIRMED.

WRIGHT, STEPHAN, and CASSEL, JJ., not participating.